2005 UT 4

JACOBSEN CONSTRUCTION COMPA-
NY, INC., a Utah corporation,
Plaintiff and Appellee,

v.

TETON BUILDERS, a Wyoming corpora-
tion, and Thomas R. Hunter, an indi-
vidual, Defendants and Appellants.

No. 20030727.

Supreme Court of Utah.

Jan. 14, 2005.

Stephen E.W. Hale, Jeffrey D. Stevens, Matthew J. Ball, Salt Lake City, for plaintiff.

R. Stephen Marshall, Erik A. Olson, Salt Lake City, for defendants.

DURRANT, Justice:

¶ 1 In this appeal we must determine whether a Utah court may properly exercise personal jurisdiction over two Wyoming defendants on the basis of a forum selection clause contained in a contract between those defendants and a Utah plaintiff. We conclude that the contractual agreement to litigate all claims in Utah is enforceable. Further, because the plaintiff's primary place of business is in Utah, there is a sufficiently rational nexus to this state to justify exercising personal jurisdiction over the defendants. Because the district court reached the same conclusion, we affirm.

## BACKGROUND

¶ 2 When reviewing a district court's pretrial determination of jurisdiction, we accept the facts alleged in the complaint as true unless controverted by affidavit or deposition. *Anderson v. Am. Soc'y of Plastic & Reconstructive Surgeons*, 807 P.2d 825, 827 (Utah 1990). Because there are no disputed facts relevant to the jurisdictional issue presented in this appeal, the following exposition is drawn from the complaint filed by Jacobsen Construction Company, Inc. ("Jacobsen") against its subcontractor, Teton Builders, and Teton Builders's president, Thomas R. Hunter (collectively "Teton"). Additional facts are taken from the parties' uncontroverted pleadings.

¶ 3 The underlying dispute between the parties to this appeal stems from a development project for the Four Seasons Resort in Jackson Hole, Wyoming (the "Project"). On June 3, 2002, Jacobsen, as general contractor, and Teton, as subcontractor, entered into a contract in relation to the Project. Pursuant to that contract, Teton was to perform rough carpentry work on the Project. Thomas R. Hunter served as a personal guarantor for his company's performance.

¶ 4 According to Jacobsen, Teton failed to finish its work within the time parameters set by the parties' agreement, forcing Jacobsen to take steps to avoid costly delays to the Project as a whole. The facts surrounding the alleged breach are far from clear at this stage in the proceeding and, in large part, are not critical to the resolution of the current appeal. As a result, the parties have, appropriately, not expended undue effort on elaborating the facts surrounding the alleged breach. However, Jacobsen does acknowledge that Teton was concerned about the Project's funding and suggests that Teton's decision to abandon the Project was based on

its trepidation, whether justified or not, about receiving payment for its work. According to Jacobsen, Teton was provided with a joint check to alleviate its concerns and to avoid potential liens against the Project.[1] Nevertheless, Teton ceased work on the Project. Jacobsen subsequently filed a complaint against Teton in Utah Third District Court, claiming that it was forced to complete Teton's work and suffered damages as a result.

¶ 5 Without answering the complaint, Teton moved for a dismissal, arguing that the district court did not have personal jurisdiction to hear the case because both Teton Builders and Mr. Hunter are residents of Wyoming and all events relevant to the formation and performance of the contract occurred in Wyoming. Teton maintains, and Jacobsen does not dispute, that it was informed of the Project through a Jacobsen satellite office located in Jackson Hole, Wyoming. Additionally, although Mr. Hunter states that "[d]uring the bidding process[ ][he] received two or three telephone calls from an estimator at Jacobsen's Salt Lake City office," it appears that all post-bid contacts between Teton and Jacobsen took place in Wyoming. Teton Builders and Mr. Hunter's essentially unchallenged position is that they have "never conducted business in any way within the State of Utah."

¶ 6 Jacobsen opposed the motion to dismiss, arguing that Teton's contacts with Utah were irrelevant because a forum selection clause in the parties' contract provided a sufficient basis upon which the district court could exercise personal jurisdiction. Teton countered that the clause was unenforceable and that, in any event, the clause only evidenced Teton's consent to venue and not to jurisdiction and thus a traditional minimum contacts analysis was still required. The pivotal contractual language states that "[a]ll arbitration proceedings and litigation shall take place within Salt Lake County, State of Utah."

¶ 7 After a hearing on the motion to dismiss, the district court concluded that the forum selection clause was enforceable. The district court also concluded that, via the forum selection clause, Teton had consented to Utah's exercise of personal jurisdiction. That conclusion implicated our holding in *Phone Directories Co. v. Henderson*, 2000 UT 64, 8 P.3d 256, that a party's consent to jurisdiction renders the traditional minimum contacts test inapplicable. *Id.* at ¶ 14. In such a case, jurisdiction may be properly exercised as long as there is a rational nexus between the litigation and the State of Utah. *Id.* at ¶¶ 14–15. Because Jacobsen's primary place of business is in Utah, the district court held that a sufficiently rational nexus existed between Utah and the parties' dispute to justify exercising personal jurisdiction over Teton. This appeal followed. We have jurisdiction pursuant to Utah Code section 78–2–2(3)(j) (2002).

¶ 8 On appeal, Teton assigns error to the district court's conclusion, primarily arguing that Utah public policy requires a dismissal under the circumstances presented by this case. Teton also contends that, even if the forum selection clause is enforceable, it evidences a consent to venue only and not to jurisdiction, rendering our decision in *Phone Directories* inapposite and a rational nexus inquiry inappropriate. Finally, Teton argues that, even if the district court properly invoked the rational nexus test, it applied that test in a manner inconsistent with prior case law. We examine each contention in turn.

## STANDARD OF REVIEW

¶ 9 The first issue to be addressed on appeal is whether the district court properly concluded that the parties' forum selection clause is enforceable. A district court's decision to enforce a forum selection clause is reviewed for abuse of discretion. *Prows v. Pinpoint Retail Sys., Inc.*, 868 P.2d 809, 810 (Utah 1993). The "court abuses its discretion in enforcing [a] forum selection clause [when the] clause is 'so unreasonable that its enforcement would be ... against both logic and the facts on the record.' " *Id.* (quoting *Personalized Mktg. Serv., Inc. v. Stotler &*

---

1. In fact, Teton did file a lien against the Project. Teton's lien was dismissed by a Wyoming district court due to procedural deficiencies. The Wyoming Supreme Court recently affirmed the lien's dismissal. *Teton Builders v. Jacobsen Constr. Co.*, 2004 WY 147, ¶ 15, 100 P.3d 1260.

*Co.*, 447 N.W.2d 447, 451 (Minn.Ct.App. 1989)).

¶ 10 Additionally, we must review the district court's denial of Teton's motion to dismiss. Because the district court did not hold an evidentiary hearing and relied only on documentary evidence, we use a correctness standard on review. *See Arguello v. Indus. Woodworking Mach. Co.*, 838 P.2d 1120, 1121 (Utah 1992) ("Where a pretrial jurisdictional decision has been made on documentary evidence only, an appeal from that decision presents only legal questions that are reviewed for correctness.").

## ANALYSIS

¶ 11 The resolution of the current appeal requires a two-part inquiry. First, we must determine whether the forum selection clause contained in the parties' contract is enforceable. Second, we must determine whether this case possesses a sufficiently rational nexus to Utah to justify the exercise of personal jurisdiction. We will address each of these issues in turn.

## I. THE PARTIES' FORUM SELECTION CLAUSE IS ENFORCEABLE BECAUSE IT IS NOT UNREASONABLE UNDER THE CIRCUMSTANCES

¶ 12 A prerequisite to determining whether the parties' forum selection clause is enforceable is discerning which state's law governs the substantive validity of the contract's terms. Due to the presence of a contractual choice of law provision, both parties agree that Wyoming law governs whether the forum selection clause is enforceable.[2] Because we agree with the parties' conclusion, we give effect to the parties' choice of law and use Wyoming law to determine if the forum selection clause is enforceable.

¶ 13 The controlling Wyoming case addressing the enforceability of forum selection clauses is *Durdahl v. National Safety Associates, Inc.*, 988 P.2d 525 (Wyo.1999). In that case, the Wyoming Supreme Court adopted the modern approach to forum selection clauses, holding that such clauses "are *prima facie* valid and will be enforced absent a demonstration by the party opposing enforcement that the clause is unreasonable or based upon fraud or unequal bargaining positions." *Id.* at 528. A party seeking to avoid enforcement of such a clause must provide "evidence that the forum selection clause is unreasonable, against any public policy of this state, or that the forum of choice ... is seriously inconvenient." *Id.* at 530.[3]

¶ 14 In this case, Teton does not contend that the forum selection clause is the result of fraud or unequal bargaining power, or that litigating the present dispute in Utah would prove so seriously inconvenient as to render the clause unenforceable. Instead, Teton attacks the enforceability of the forum selection clause exclusively on public policy grounds. Although Teton mentions Wyoming public policy, Teton's arguments focus almost entirely on Utah public policy, stating that the clause's violation of Utah public policy renders the clause unenforceable. Jacobsen responds that Utah public policy is irrelevant to the inquiry because, as the Wyoming Supreme Court stated in *Durdahl*, a party seeking to avoid a forum selection clause on policy grounds must present evidence that the clause violates a "public policy of *this* state," meaning Wyoming. 988 P.2d at 530 (emphasis added). Consequently, Jacobsen maintains that only Wyoming's public policy is relevant to an enforceability analysis.

¶ 15 We disagree that *Durdahl* represents a clear statement that only Wyoming public

---

**2.** *See Restatement (Second) of Conflict of Laws* § 187 (Supp.1988); *see also id.* cmt. d. ("[T]he rule of [section 187(2) ] applies when it is sought to have the chosen law determine issues which the parties could not have determined by explicit agreement directed to the particular issue. Examples of such questions are those involving capacity, formalities and substantial validity.").

**3.** The analysis utilized in *Durdahl* appears consistent with the approach outlined in section 80 of the Second Restatement of Conflict of Laws, which has been adopted by the majority of jurisdictions, including Utah. *See Prows v. Pinpoint Retail Sys., Inc.*, 868 P.2d 809, 812 (Utah 1993) ("The modern view adopted by a majority of courts and which we adopt today is set forth in section 80 of the Second Restatement of Conflict of Laws....").

policy is relevant when undertaking an enforceability analysis. Neither the majority approach outlined in section 80 of the Second Restatement of Conflict of Laws nor *Durdahl* definitively address which state's public policy is relevant to the enforceability analysis. Similarly, we have had no occasion to address the role public policy should play in a situation like the one before us.[4] *Durdahl's* express mentioning of public policy does indicate that Wyoming, consistent with the majority approach, considers public policy a factor worthy of analysis when determining whether a forum selection clause is enforceable. However, *Durdahl* does not clearly state whether Wyoming law always requires an analysis of *Wyoming* public policy or whether Wyoming law requires the forum in which the suit is brought to consider *the forum state's own* public policy.

¶ 16 Teton's contention that Utah's public policy plays a significant role in the present determination has support. As stated in *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), "[a] contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy *of the forum in which suit is brought,* whether declared by statute or by judicial decision." *Id.* at 15, 92 S.Ct. 1907 (emphasis added) (citing *Boyd v. Grand Trunk W.R. Co.*, 338 U.S. 263, 70 S.Ct. 26, 94 L.Ed. 55 (1949)); *see also Roby v. Corp. of Lloyd's,* 996 F.2d 1353, 1363 (2d Cir.1993) (a forum selection clause is unreasonable if it "contravene[s] a strong public policy of the forum state").

¶ 17 However, turning a blind eye to the public policy of Wyoming would be a disservice to the parties' express agreement that Wyoming law should govern the enforceability of contractual terms. If a contractual term would be unenforceable in Wyoming as contrary to that state's public policy, enforcing that term would violate the parties'

agreement that Wyoming law govern substantive enforceability questions.

¶ 18 Consequently, we hold that in a situation like that presented in this case, an inquiry into the public policy of each of the interested states is required. Undertaking a dual public policy analysis is not unusual in actions involving forum selection clauses and, in fact, provides the most appropriate course for addressing the effect of such clauses. In *Cerami–Kote, Inc. v. Energywave Corp.,* 116 Idaho 56, 773 P.2d 1143 (1989), for example, the Idaho Supreme Court looked to Florida law when conducting an analysis of the enforceability of a forum selection clause and concluded that such clauses must be enforced, pursuant to Florida law, if " '[e]nforcement would not contravene a strong policy enunciated by statute or judicial fiat, *either in the forum where the suit would be brought, or the forum from which the suit has been excluded.'* " *Id.* at 1146 (original emphasis omitted) (emphasis added) (quoting *Maritime Ltd. P'ship v. Greenman Adver. Assocs., Inc.,* 455 So.2d 1121, 1123 (Fla.Dist. Ct.App.1984)). Citing Idaho statutory authority that would render the forum selection clause unenforceable, the *Cerami–Kote* court struck down the clause and allowed the action to proceed in Idaho. *Id.* at 1147.

¶ 19 In the current case, we are persuaded that conducting a dual public policy analysis is the most effective way to give effect to the parties' choice of Wyoming law while simultaneously ensuring that Utah courts do not enforce a provision that offends our own state's public policy. While Wyoming's articulation of its law thus far has not unambiguously directed a foreign forum applying Wyoming law to conduct an analysis of the forum's own public policy, we conclude that such an analysis is essential. Otherwise, parties could employ choice of law provisions to force forum states to enforce contractual terms wholly repugnant to local public policy. *Cf. Trillium USA, Inc. v. Bd. of County*

---

4. *Prows v. Pinpoint Retail Systems, Inc.,* 868 P.2d 809, 811 (Utah 1993), does mention in passing an argument made by defendant Pinpoint Retail Systems, Inc. ("Pinpoint") that is related to our present inquiry. In that case, Pinpoint argued that (1) the parties chose New York law to govern their contract; (2) under New York law, prelitigation forum selection clauses are presump-

tively enforceable; and (3) such a presumption does not "contravene any strong public policies of the State of Utah." *Id.* (internal quotation omitted). However, in *Prows* we declined to give effect to the parties' choice of law and therefore did not comment on whether Pinpoint's construction of the appropriate inquiry was correct. *Id.*

*Comm'rs*, 2001 UT 101, ¶ 19, 37 P.3d 1093 ("In determining whether it is appropriate to extend comity in a given case, 'of primary importance [to Utah courts] is whether [Utah's] public policies ... would be contravened if comity were extended.' " (quoting *Jackett v. L.A. Dep't of Water & Power*, 771 P.2d 1074, 1076 (Utah Ct.App.1989))).

¶ 20 Consequently, we must first determine if a strong public policy of Wyoming would be violated by enforcing the parties' forum selection clause. Then we must conduct an analysis of Utah public policy to ensure that enforcement of the clause would not run contrary to a strong public policy of Utah.

### A. The Forum Selection Clause Does Not Violate Wyoming Public Policy

¶ 21 According to Teton, the forum selection clause violates Wyoming public policy because Wyoming has expressed a statutory interest in the venue of lien foreclosure actions. This argument is based on section 1–5–101 of the Wyoming Statutes, which provides that lien foreclosure actions must be brought in the county where the property that is the subject of the lien is located. Wyo. Stat. Ann. § 1–5–101 (2004). Teton contends that this statute expresses Wyoming's policy that all litigation relevant to a lien should be conducted in the county where the lien foreclosure action is commenced.

¶ 22 However, because the Wyoming Supreme Court has dismissed Teton's lien, the venue statute is inapplicable to the current controversy. There is, quite simply, no lien to foreclose and therefore no litigation relevant to a lien.

¶ 23 Even if Teton's lien remained viable, we would still be disinclined to conclude that the venue statute expresses a strong policy interest inconsistent with litigating the present dispute in Utah. Although Wyoming law does require lien foreclosure actions to be commenced in the county where the property subject to the lien is located, it does not necessarily follow that such a policy would prohibit Jacobsen from pursuing its claims in Utah, even if Teton had possessed a viable lien. The statute itself does not impose a requirement that all claims related to a lien

must be litigated in the county where the lien foreclosure action is undertaken. Presumably, a plaintiff could pursue tort or contract claims in a convenient forum and initiate a lien foreclosure action in the county designated by the venue statute while the other claims were pending or after their resolution.

¶ 24 Additionally, reading the venue statute to so severely restrict possible venues for litigation becomes even more inappropriate when the parties involved have expressly contracted to litigate their disputes in another forum. In fact, such a reading would undermine Wyoming's public policy of giving effect to express agreements between parties. *See, e.g., Lieberman v. Wyoming.com LLC*, 2004 WY 1, ¶ 18, 82 P.3d 274 (Wyoming law requires courts to enforce contracts "as written and accepted by the parties"); *Snyder v. Lovercheck*, 992 P.2d 1079, 1089 (Wyo. 1999) ("[I]n private disputes, a court must enforce the contract as drafted by the parties and may not relieve a contracting party from anticipated or actual difficulties undertaken pursuant to the contract....").

¶ 25 Consequently, Teton has failed to identify a strong public policy of Wyoming that would render the parties' forum selection clause unenforceable. Therefore, we must now determine whether enforcing the clause would run contrary to a strong public policy of the State of Utah.

### B. The Forum Selection Clause Does Not Violate Utah Public Policy

¶ 26 Teton contends that two public policies of Utah prohibit the enforcement of the parties' forum selection clause. First, Teton contends that Utah public policy dictates that construction disputes should be litigated in the state where the construction project is located. Second, Teton argues that exercising jurisdiction would violate Utah's public policy against duplicative litigation. Each of these contentions will be discussed in turn.

#### 1. Utah's public policy regarding venue in construction litigation

¶ 27 Teton argues that Utah's public policy regarding the proper venue to resolve con-

struction contract disputes dictates that the present case should be litigated in Wyoming. In support of this contention, Teton cites section 13–8–3(2) of the Utah Code, which declares unenforceable any forum selection clause contained in a construction contract that requires litigation in a state other than Utah when one of the parties to the contract is a Utah resident and the agreement relates to a construction project in Utah. Utah Code Ann. § 13–8–3(2) (2001). Teton argues that this statute codifies a more general Utah public policy declaring that construction disputes should be litigated in the state in which the project is located. Because the Project in the present dispute is located in Wyoming, Teton argues that Utah courts should refuse to hear the present case.

¶ 28 Teton's argument is not persuasive. The primary purpose of section 13–8–3 is to prohibit out-of-state contractors, construction managers, or suppliers from haling a Utah resident into a foreign state's court when the work by the Utah resident is performed within the State of Utah. The statute furthers Utah's policy interest in providing its residents with a forum in which they can pursue their legal claims. *See* Utah Code Ann. § 78–27–22 (2002); *Trillium*, 2001 UT 101 at ¶ 20, 37 P.3d 1093. Therefore, contrary to Teton's assertions, the policy expressed by section 13–8–3 would be best served by enforcing the forum selection clause at issue in this case and allowing Jacobsen to litigate its claims in its home state.

2. Utah's public policy regarding duplicative litigation

¶ 29 Teton also contends that if Utah exercises jurisdiction, it will lead to duplicative litigation in contravention of Utah public policy. In support of this argument, Teton relies exclusively on *Prows v. Pinpoint Retail Systems, Inc.*, 868 P.2d 809 (Utah 1993). In *Prows*, we refused to enforce a forum selection clause because, among other reasons, the clause would have required the plaintiff to proceed against codefendants in two different forums. *Id.* at 812–13. A bifurcated trial would have been necessary because only one of the two defendants would enjoy the

protection of the forum selection clause and the other defendant would not have been subject to the personal jurisdiction of the selected forum. *See id.* The *Prows* court pointed out that "[r]equiring a bifurcated trial on the same issues contravenes the objective of modern procedure, which is to litigate all claims in one action if that is possible." *Id.* at 813 (internal quotation omitted).

¶ 30 If Teton had possessed a viable lien in Wyoming, the policy concerns articulated in *Prows* may have been implicated. However, the Wyoming Supreme Court's dismissal of Teton's lien renders such concerns moot. As a result, it is not necessary to determine whether the possibility of related litigation in Wyoming would undermine the parties' express agreement to litigate all claims in Utah.

¶ 31 Given the above analysis, we conclude that the district court did not abuse its discretion by holding the forum selection clause enforceable. We must next determine whether that clause alone is sufficient to allow Utah to exercise jurisdiction over this dispute.

## II. BECAUSE TETON CONSENTED TO JURISDICTION, THE RATIONAL NEXUS TEST APPLIES AND IS SATISFIED BY THE FACT THAT JACOBSEN'S PRIMARY PLACE OF BUSINESS IS IN UTAH

¶ 32 In the absence of a forum selection clause, Utah courts conduct a three-part inquiry when determining whether exercising specific personal jurisdiction over a particular defendant is appropriate. *Phone Directories Co. v. Henderson*, 2000 UT 64, ¶¶ 12, 14, 8 P.3d 256; *see also Harnischfeger Eng'rs, Inc. v. Uniflo Conveyor, Inc.*, 883 F.Supp. 608, 612–13 (D.Utah 1995). However, in *Phone Directories* we concluded "that a different inquiry should be made in cases involving contractual forum selection/consent-to-jurisdiction clauses." 2000 UT 64 at ¶ 14, 8 P.3d 256. When an enforceable forum selection clause exists, we require only a "rational nexus" between Utah and the underlying dispute. *Id.* This nexus need not meet the more rigorous minimum contacts

standard utilized in those cases where a forum selection clause is not present. *Id.*

¶ 33 Teton first argues that the approach outlined in *Phone Directories* applies only when a defendant has consented to jurisdiction, and that a consent to venue alone is not enough to implicate the relaxed *Phone Directories* standard. Therefore, we must address whether there is a meaningful difference between consenting to venue and consenting to jurisdiction.

¶ 34 Teton relies exclusively on *Phone Directories* to support its contention that Utah recognizes a distinction between consent to venue and consent to jurisdiction clauses. *Phone Directories* involved an employment contract that contained what the court referred to as "a forum selection/consent-to-jurisdiction clause." *Id.* at ¶ 14. The lead opinion, authored by Justice Durham and joined by Judge Bench, who sat by designation, concluded that the traditional personal jurisdiction minimum contacts analysis could be properly abandoned due to the presence of the "forum selection/consent-to-jurisdiction clause." *Id.* Chief Justice Howe, writing separately, concurred in the result. *Id.* at ¶¶ 20–22. Teton takes the position that Chief Justice Howe concurred in the use of the rational nexus test only when there is a consent to jurisdiction clause and not when there is a consent to venue alone. Based on this assertion, Teton contends that *Phone Directories* does not have a controlling majority opinion that governs situations where a potential litigant has consented only to venue.

¶ 35 However, the contractual language at issue in this case is properly read as including consent to both venue and jurisdiction. Therefore, even under Teton's reading of *Phone Directories*, the district court was correct in utilizing the rational nexus test.

### A. Teton Consented to Jurisdiction by Implication

¶ 36 The sentence at the heart of this jurisdictional dispute reads simply, "[a]ll arbitration proceedings and litigation shall take place within Salt Lake County, State of Utah." Several cases across the nation have addressed whether similar contractual language operates as a consent to both venue and jurisdiction. While the parties have cited no controlling authority directly on point, there is an abundance of support for the proposition that language such as that at issue in this case should be read as including consent to both venue and jurisdiction.

¶ 37 For example, in *Resource Ventures, Inc. v. Resources Management International, Inc.*, 42 F.Supp.2d 423, 432 (D.Del.1999), the court had to determine whether the contractual language, "in the event of litigation, the case shall be tried by the appropriate courts in the State of Delaware," evidenced a consent to both venue and jurisdiction. The defendants in that case "concede[d] that this is a forum selection clause but [argued] that it d[id] not subject [them] to the Court's jurisdiction because the clause contains no reference to jurisdiction." *Id.* The court concluded that the clause did contain a consent to jurisdiction, reasoning as follows:

> Since the parties have asserted that the purpose of the clause was to provide a forum in the event of litigation, then the parties must have also intended the clause to be an agreement as to personal jurisdiction so that any lawsuit could be maintained in the Delaware forum. Any other interpretation would render the clause senseless because no litigation could proceed without a court having personal jurisdiction over the parties.

*Id.; see also Citizen's Bank v. W. Shore Surgical Assocs. LLC*, 15 Mass. L. Rep. 514, 514, 2002 WL 31973240 (Mass.Sup.Ct.2002) ("In this case, venue is established by a provision in the finance lease. This provision, therefore, also determines jurisdiction because venue can only be established once jurisdiction is clear.").

¶ 38 In *Kysar v. Lambert*, 76 Wash.App. 470, 887 P.2d 431, 441 (1995), the court pointed out that "[a]ccording to most courts, a choice-of-forum clause shows consent to personal jurisdiction, even though it refers only to venue." *See also, e.g., Northwestern Nat'l Ins. Co. v. Donovan*, 916 F.2d 372, 377 (7th Cir.1990) ("There would be no point to a clause that placed venue in Milwaukee County ... but left the defendants free to object

that they were outside the court's jurisdiction."); *accord Northwestern Nat'l Ins. Co. v. Dennehy*, 739 F.Supp. 1303, 1306 (E.D.Wis. 1990) ("The court finds that when a party consents to venue in a particular court, it implicitly consents to the exercise of personal jurisdiction by that court."); *Mut. Fire, Marine & Inland Ins. Co. v. Barry*, 646 F.Supp. 831, 833–34 (E.D.Pa.1986) ("[T]he courts have determined that venue selection clauses contain an implied consent to personal jurisdiction.").

■ ¶ 39 We find the reasoning of the above-cited cases compelling and hold that forum selection clauses need not make specific mention of a consent to jurisdiction when the language of the clause makes the parties' intention to resolve disputes in a particular forum evident. As a result, we conclude that Teton consented to the jurisdiction of Utah via operation of the forum selection clause and therefore the district court was correct in applying the rational nexus test outlined in *Phone Directories*.

### B. The Rational Nexus Test Is Satisfied Because Jacobsen's Primary Place of Business Is in Utah

■ ¶ 40 Teton contends that, even if *Phone Directories* applies to the current case, the fact that Jacobsen's primary place of business is in Utah is not sufficient to meet *Phone Directories's* rational nexus requirement. We disagree.

■ ¶ 41 The rational nexus test is not properly considered a due process requirement.[5] Rather it operates as a safety valve, providing a mechanism whereby Utah courts may decline to exercise jurisdiction when Utah has no real interest in the outcome of a given dispute. "The potential risks of expanded jurisdiction—particularly the waste of judicial resources—are addressed by the requirement of a rational nexus between this state and either the parties to or the subject matter of the contract." *Phone Directories*, 2000 UT 64 at ¶ 15, 8 P.3d 256.

¶ 42 For example, under certain circumstances it may be reasonable for a resident of Colorado and a resident of Wyoming to bargain for a forum selection clause designating Utah as the appropriate forum for any dispute arising in relation to a contract to be performed in Nevada. A Utah court hearing a subsequent action brought pursuant to the contract could very well find that the forum selection clause was reasonable under the circumstances, but nevertheless decline to exercise jurisdiction over the matter due to the lack of a rational nexus to Utah.

■ ¶ 43 In this case, the rational nexus test is satisfied because Jacobsen's primary place of business is in Utah. Teton contests this conclusion, pointing to language in *Phone Directories* suggesting that there must be a nexus between Utah and the "parties" to the litigation. *See id.* at ¶ 14. However, because both of the parties in *Phone Directories* had contacts with Utah, we were not forced to confront the question presented by the current appeal; specifically, can one party's connection to Utah be sufficient to satisfy the rational nexus inquiry? Given the purpose served by the rational nexus test, we now answer that question in the affirmative. We do note, however, that the nexus between the underlying dispute and the State of Utah must be truly "rational." Consequently, the mere presence of a post office box maintained in Utah by a litigant, for example, or the fact that parties wholly unconnected to Utah reasonably viewed Utah as providing a fair forum for a potential future dispute, would not provide a sufficiently rational nexus to justify the exercise of personal jurisdiction.

### CONCLUSION

¶ 44 The forum selection clause agreed to by Teton does not contravene a strong public policy interest of Wyoming or Utah and is therefore enforceable. The language of the clause evidences Teton's implied consent to Utah's jurisdiction, implicating the relaxed jurisdictional analysis outlined in *Phone Directories Co. v. Henderson*, 2000 UT 64, 8

---

**5.** *See, e.g., Morgan Bank (Del.) v. Wilson*, 164 Ariz. 535, 794 P.2d 959, 961 (Ct.App.1990) (implying that if a forum selection clause survives an enforceability analysis, due process is not offended by using that clause as a sole basis for the exercise of personal jurisdiction).

P.3d 256. The rational nexus test is satisfied in the present case because Jacobsen's primary place of business is in Utah. For the foregoing reasons, we affirm.

¶ 45 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Justice DURRANT'S opinion.