FILED
United States Court of Appeals
Tenth Circuit

June 11, 2015

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

WAKEFIELD KENNEDY, LLC, a
Washington limited liability company,

        Plaintiff Counterclaim
        Defendant - Appellant,

v.

STATE CAPITAL HOLDINGS, LLC,
a New York limited liability company,

        Defendant Counterclaimant
        - Appellee,

v.

METRO NATIONAL SETTLEMENT
SERVICES, LLC, a Utah limited liability
company,

        Defendant Cross Claim
        Defendant - Appellee,

and

D. SHANE BALDWIN, an individual,
MARK STAPLES, an individual;
SILVERLEAF FINANCIAL 9, LLC,
a Utah limited liability company;
SILVERLEAF FINANCIAL, LLC,
a Utah limited liability company,

        Defendants Cross
        Claim Defendants.

No. 14-4044
(D.C. No. 2:11-CV-00604-DN-EJF)
(D. Utah)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE**, Chief Judge, **PORFILIO** and **LUCERO**, Circuit Judges.

---

This appeal concerns competing claims to a promissory note (Note) and associated documents (together, the Woodland Mall Loan Documents or WMLD). The district court determined that State Capital Holdings, LLC (State Capital), as purchaser of the WMLD, held a superior claim to that of Wakefield Kennedy (Wakefield), a secured creditor. Wakefield appeals the district court's partial summary judgment order subordinating Wakefield's claim to State Capital's and ordering delivery of the WMLD to State Capital. We affirm.

## BACKGROUND

State Capital agreed to purchase the WMLD from their holder, Silverleaf Financial 9, LLC (Silverleaf). State Capital and Silverleaf memorialized their purchase terms in a Loan Sale Agreement (LSA) dated December 28, 2009.

---

[*]      After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

*The Loan Sale Agreement Escrow*

The LSA set a closing date of February 1, 2010. It provided that an escrow would be opened "for the consummation of the transfer of the Assigned Rights and Obligations to [State Capital]." Aplt. App., Vol. 2 at 555. The escrow holder was Metro National Settlement Services, LLC (Metro).[1]

The LSA required Silverleaf to deposit the original Note endorsed to State Capital, along with an assignment of the mortgage and of Silverleaf's security interest documents, into the escrow with Metro. If the original Note was not in Silverleaf's possession at closing, Silverleaf was required to "take such action as may be required to obtain [it] or provide . . . documentation that is satisfactory to [State Capital]." *Id.*, Vol. 2 at 558.

*Wakefield's November 2009 Loan to Silverleaf*

At the time the LSA was signed, Silverleaf did not have physical possession of the Note. Wakefield held it and the other WMLD as security for a November 2009 loan that Wakefield had made to Silverleaf. Silverleaf planned to use proceeds from its sale of the WMLD to State Capital to pay off the loan from Wakefield.

To facilitate the payoff of its November 2009 loan to Silverleaf and the release of the WMLD back to Silverleaf, Wakefield sought its own escrow arrangement with

---

[1]    The LSA designated "Metro National Title Company," an affiliated business, as escrow holder, apparently by mistake. Metro Settlement assumed the duties assigned to Metro Title and the distinction between the two companies is not an issue in this appeal.

Metro. On January 28, 2010, Wakefield's attorney sent escrow instructions to Metro, asking it to follow these instructions "for the benefit of [Wakefield] for releasing its security interest in the [WMLD]." *Id.*, Vol. 4 at 906.

In its escrow instructions, Wakefield stated it had delivered or would deliver its original loan file, including the Note, to Metro in connection with the February 1 LSA closing. Once Silverleaf's payoff funds were received and disbursed to Wakefield, Metro was to "[d]eliver the [WMLD] Loan Files to [Silverleaf's] designee." *Id.* at 907. But if the February 1 closing did not occur, Metro was to send the loan files back to Wakefield.

*Postponements of the Scheduled Closing*

The closing did not occur as scheduled on February 1. On February 5, 2010, Silverleaf and State Capital amended the LSA to reschedule the closing for March 8, 2010. The WMLD remained with Metro.

On March 8, the closing again did not occur. On March 18, Silverleaf and State Capital again amended the LSA to reschedule the closing for May 24, 2010. Wakefield's attorney sent supplemental escrow instructions to Metro. These instructions modified the payoff amount but did not change the prior instructions regarding disposition of the WMLD and proceeds upon payoff.

Also in March 2010, Silverleaf repaid the November 2009 loan from Wakefield. After the payoff funds were disbursed to Wakefield, Metro continued to hold the WMLD. The parties disagree concerning the capacity in which Metro now

held the WMLD. State Capital contends that Metro held the documents in escrow, as contemplated by the LSA. But Wakefield argues that Metro merely had "custody" of the WMLD for Silverleaf's benefit, an arrangement that Wakefield argues posed no impediment to Silverleaf's ability to further encumber the WMLD.

On May 24, the closing was again postponed. On that date, Silverleaf and State Capital entered into a Third Amendment to the LSA, which extended the closing date until December 31, 2010.

*The Second Wakefield Loan and Custody Agreement*

On June 14, 2010, unbeknownst to State Capital, Wakefield made a new loan to Silverleaf. Silverleaf pledged its interest in the WMLD to Wakefield as security. Silverleaf entered into a Custody Agreement with Metro and Wakefield. State Capital was not a party to the Custody Agreement.

The Custody Agreement acknowledged that "[t]he Pledged Note is currently subject to" the LSA and amendments thereto, and that Metro was "acting as escrow agent in connection with the [LSA]." *Id.*, Vol. 2 at 449. The Custody Agreement further stated that Metro "has possession of the Pledged Note and will continue to hold the Pledged Note on [Wakefield's] behalf." *Id.* The parties acknowledged that Silverleaf had "delivered the Pledged Note to [Metro] to hold until the closing of the transaction referenced in the [LSA]." *Id.*

Silverleaf also signed a Note Pledge Agreement in which it agreed to pledge its right, title and interest in the Note and its proceeds to Wakefield, including its

rights under the LSA, "subject to the rights of [State Capital]." *Id.*, Vol. 1 at 137. Silverleaf purported to grant Wakefield a "first position security interest in the . . . Note and all payments made thereunder and proceeds thereof." *Id.* at 138. To reflect this security interest, Wakefield recorded a UCC-1 filing statement with the Utah Department of Commerce.

*The December 31 Closing*

On December 31, 2010, State Capital completed its payment obligations under the LSA and amendments. Acting on instructions from Silverleaf, Metro's employee wired the funds State Capital had deposited with Metro to Silverleaf, apparently without requiring evidence that Silverleaf had repaid the June 2010 loan to Wakefield. Silverleaf, having received the funds, did not use them to repay the Wakefield loan. Nor did Metro, notwithstanding its obligations under the LSA, release the WMLD to State Capital as required. Instead, citing Wakefield and State Capital's conflicting claims to the WMLD, Metro interpleaded the WMLD to be held and disposed of by the district court.

This left the district court to sort out the priority to the WMLD and to provide for their disposition. After both Wakefield and State Capital moved for partial summary judgment concerning priority to the WMLD, the district court concluded that "Wakefield's claim is subordinate to State Capital's rights and State Capital is entitled to delivery of the Woodland Mall Loan Documents." *Id.*, Vol. 4 at 1174. It reached this conclusion for two reasons. First, Silverleaf's deposit of the WMLD

into the LSA escrow made State Capital their equitable owner and precluded Silverleaf from granting Wakefield any interest in the WMLD superior to State Capital's. Second, the Uniform Commercial Code (UCC) gave State Capital priority to the WMLD, as their purchaser, over Wakefield's security interest. Consequently, the district court granted State Capital's motion for partial summary judgment, denied Wakefield's motion for partial summary judgment, and awarded State Capital the right to delivery of the WMLD.

Wakefield appealed. After we issued an order to show cause concerning our appellate jurisdiction, the district court certified its judgment as final and appealable under Fed. R. Civ. P. 54(b). Accordingly, we have jurisdiction to consider this appeal.

**ANALYSIS**

**1. Standard of Review**

"We review a district court's grant of summary judgment de novo." *SEC v. Thompson*, 732 F.3d 1151, 1156 (10th Cir. 2013). Summary judgment should be granted when "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reaching that determination, we "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Thompson*, 732 F.3d at 1157 (alterations and internal quotation marks omitted).

## 2. Choice of Law/Diversity

Federal jurisdiction in this case is based on diversity of citizenship. *See* 28 U.S.C. § 1332. In a diversity case, a federal court looks "to the substantive law of the forum state, including its choice of law principles, to determine the applicable substantive law." *Boyd Rosene & Assocs. v. Kan. Mun. Gas Agency*, 174 F.3d 1115, 1118 (10th Cir. 1999).

The district court concluded that New York law applied to this dispute. Under Utah's choice of law rules, a contractual provision selecting a particular state's law will be upheld. *See Jacobsen Constr. Co. v. Teton Builders*, 106 P.3d 719, 723 (Utah 2005) (upholding parties' contractual choice of law provision). Because the parties chose New York law to govern the interpretation and the effect of the LSA, including the effect of the escrow arrangement it created, New York law applies to those questions. But we agree with Wakefield that to the extent the dispute turns on perfection or priority of a security interest in the Note, Utah's version of the UCC applies. *See* Utah Code Ann. § 70A-9a-301(1) ("Except as otherwise provided in this section, while a debtor [here, Silverleaf] is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral."); *id.* § 301(2) ("While collateral [here, the WMLD] is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a possessory security interest in that collateral.").

- 8 -

### 3. Priority to the WMLD

#### A. Equitable Ownership Interest Created by Escrow of Documents

The district court reasoned that "[n]o later than March 2010, when the Woodland Mall Loan Documents were in Metro's possession in escrow and Silverleaf's December 2009 obligation to Wakefield was fully paid, Silverleaf lost control over the instruments and State Capital became the equitable owner of them by virtue of the LSA." Aplt. App., Vol. 4 at 1174 (footnote and internal quotation marks omitted). It further concluded that because the documents were in escrow, "Silverleaf lost the ability to grant to a third party any rights superior to State Capital's [equitable ownership interest]." *Id.*

Wakefield does not deny that Metro obtained physical possession of the WMLD, but it contends that the requirements for a deposit into escrow were not met. Under New York law, "[f]or an instrument to be held in escrow, there must be (a) an agreement regarding the subject matter and delivery of the instrument, (b) a third-party depositary, (c) delivery of the instrument to a third party conditioned upon the performance of some act or the occurrence of some event, and (d) relinquishment by the grantor." *Lennar Ne. Partners Ltd. P'ship v. Gifaldi*, 695 N.Y.S.2d 448, 450-51 (N.Y. App. Div. 1999). Wakefield argues that the last two requirements (delivery with relinquishment) were not met because Silverleaf did not relinquish its right of possession and control of the WMLD by delivering them into escrow.

Whether an irrevocable deposit into escrow has been made rests on the intent of the parties. *See* 55 N.Y. Jur.2d *Escrows* § 8 (2015). Wakefield has failed to demonstrate a genuine factual dispute concerning Silverleaf's intent to deliver, or the actual delivery of, the WMLD into escrow. The language of the LSA reveals Silverleaf's intent to deposit the WMLD with Metro to be held under its terms in order to facilitate their sale to State Capital. There is no evidence that after Wakefield delivered the documents to Metro and Silverleaf paid off its November 2009 loan to Wakefield, Silverleaf attempted to retrieve the documents. Instead, Silverleaf left them with Metro, the escrow agent named in the LSA.

It is inconsequential that the LSA did not *require* Silverleaf to place the WMLD into escrow at a specific date prior to closing. Nothing prohibited Silverleaf from leaving the documents on deposit with Metro, even prior to closing. Nor would it make sense to require Silverleaf to prove its intent to place the WMLD into the LSA escrow by insisting that Silverleaf (1) request that Metro return the WMLD to Silverleaf, then (2) send those same documents back to Metro with instructions to place them into escrow for closing of the sale to State Capital.

Although Wakefield also complains that there was no "further direction from Silverleaf for Metro to hold the Note in escrow for the benefit of State Capital," Aplt. Opening Br. at 25, Silverleaf had already given Metro direction in the LSA. By its terms the LSA "constitute[d] the joint escrow instructions of [State Capital and Silverleaf] to open escrow . . . for the consummation of the transfer of the Assigned

- 10 -

Rights and Obligations to [State Capital]." Aplt. App., Vol. 2 at 555. Wakefield

fails to show that any further expression of Silverleaf's intent was required to create

the escrow.[2]

Wakefield argues that the execution of the Custody Agreement shows that

neither Silverleaf nor Metro believed that Silverleaf had relinquished control of the

WMLD into escrow. But the Custody Agreement acknowledges that Metro was

acting as escrow agent in connection with the LSA and was holding the Note until the

closing of the sale to State Capital. The fact that Metro purported to take on an

additional role as custodian of the WMLD in connection with Wakefield's June 2010

loan to Silverleaf did not vitiate Metro's existing role as escrow holder for the sale to

State Capital. Finally, even if Silverleaf acted inconsistently with relinquishment of

control over the WMLD by pledging them to Wakefield, Silverleaf's conduct

occurred several months after March 2010, after the documents had already been

deposited into escrow. Evidence of Silverleaf's later conduct does not preclude a

valid, earlier deposit of the documents into escrow under the LSA. We thus

conclude, with the district court, that at the time Wakefield made the June 2010 loan,

the WMLD were held in escrow under the LSA pending the sale to State Capital.

---

[2] The facts of this case differ significantly from the cases Wakefield cites, *Silberstein v. Murdoch*, 215 N.Y.S. 657, 662 (N.Y. App. Div. 1926), in which documents in a sealed envelope were deposited with a trust company without any escrow agreement at all, and *Menkis v. Whitestone Sav. & Loan Ass'n*, 356 N.Y.S.2d 485, 487-88 (N.Y. Dist. Ct. 1974), which involved only a mortgage bond between a mortgagor and mortgagee.

As noted, the district court granted priority to State Capital because it found that, having placed the WMLD documents into escrow, Silverleaf "lost the ability to grant to a third party any rights superior to State Capital's [equitable ownership interest]." *Id.*, Vol. 4 at 1174. As an alternative argument, Wakefield contends that even if Silverleaf made an unconditional deposit into escrow, this would not have given State Capital a superior interest, because the "principle of equitable title" does not apply to the priority of a perfected security interest in negotiable instruments. Instead, Wakefield contends, priority of such instruments is governed exclusively by UCC priority principles. *See* Aplt. Opening Br. at 27.[3] But even if we accept Wakefield's argument that the UCC governs the priority issue to the exclusion of broader equitable principles, the argument fails. As the district court correctly concluded, State Capital had priority under the UCC priority scheme and State Capital would thus still be entitled to delivery of the WMLD.

---

[3] Although Wakefield made arguments about UCC priority in district court, it did not make this particular argument. For this reason, we could simply decline to consider the argument. *See DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1195 (10th Cir. 2010) ("We . . . generally will not consider new arguments on appeal . . . even one that falls under the same general category as an argument presented [in district court]" (internal quotation marks omitted)). But because Wakefield's "UCC exclusivity" argument flows into the broader UCC argument that Wakefield preserved in district court and now presents on appeal, we will consider the arguments together to show why both fail.

## B. Priority Under the UCC

We next consider, under Utah's version of the UCC, whether the security interest Silverleaf granted to Wakefield had priority over State Capital's interest as purchaser. Clearly, it did not.

The district court found that State Capital's interest as purchaser had priority under Utah Code Ann. § 70A-9a-330(4), which provides that in general, "a purchaser of an instrument has priority over a security interest in the instrument perfected by a method other than possession if the purchaser gives value and takes possession of the instrument in good faith and without knowledge that the purchase violates the rights of the secured party." The district court determined that State Capital gave value and took possession of the WMLD in good faith, without knowledge of Wakefield's alleged security interest, and therefore satisfied the requirements for priority under this subsection.[4]

Wakefield makes two arguments that it has priority under the UCC. First, Wakefield contends that to "perfect" its "security interest" under § 330(4), State Capital was required either to file a security agreement signed by Silverleaf or to take possession of the WMLD. Wakefield contends State Capital did neither.

---

[4]     This UCC section is designed to protect good-faith purchasers of instruments encumbered by a *prior* security interest. *See* 4 James J. White, Robert S. Summers & Robert A. Hillman, *Uniform Commercial Code* § 33-10 (6th ed. 2014). As the district court found, at the time when the documents were escrowed for State Capital's benefit, Wakefield did not yet have a perfected security interest in them to secure the June 2010 loan. Aplt. App., Vol. 4 at 1179. This makes Wakefield's claim to priority even less plausible.

By contrast, Wakefield purports to be the holder of a perfected security interest in the WMLD, which it obtained either by possessing the WMLD or by filing its UCC-1 financing statement signed by Silverleaf. Citing general principles governing secured transactions, Wakefield thus claims priority as a secured party over State Capital's "unsecured" interest.

The district court aptly rejected Wakefield's argument, reasoning as follows:

> Wakefield . . . argues that § 330(4) grants a *security interest* and that a party relying on § 330(4) must also abide by [other UCC provisions] which would require a security agreement. Wakefield is incorrect as § 330(4) does not grant an actual security interest but rather grants *a purchaser* of an instrument . . . *priority* over a *security interest* created [under the UCC.] Wakefield's argument that State Capital did not have a security interest is therefore irrelevant.

Aplt. App., Vol. 4 at 1180 (footnote omitted).

Granted, § 330(4) does require the purchaser to "take[] possession of the instrument," even if such possession is not required to create a "security interest." But State Capital satisfied this requirement through Metro's possession of the WMLD under the terms of the LSA, which occurred *before* the creation of Wakefield's purported security interest and before any possession for Wakefield's benefit under the Custody Agreement.[5]

---

[5] Constructive possession of an instrument has been recognized in cases involving the UCC's related "holder in due course" principle. *See Georg v. Metro Fixtures Contractors, Inc.*, 178 P.3d 1209, 1214 (Colo. 2008) (collecting cases). For similar reasons, Metro could constructively possess the WMLD on behalf of State Capital, thus fulfilling the possession requirement of § 330(4).

- 14 -

The district court also correctly rejected Wakefield's argument that State Capital's interest as purchaser did not satisfy § 330(4) because Wakefield had perfected its security interest by possession of the WMLD:

> Wakefield's argument that it has a valid possession-perfected security interest and therefore has priority is also incorrect. . . . Wakefield fails to acknowledge that Metro had possession of the [WMLD] free of any claim of Wakefield from March 2010, well before the June 2010 Custody Agreement. When the Wakefield-Silverleaf obligation was paid off in March 2010, the [WMLD] were, as Silverleaf promised, in escrow for State Capital's benefit. . . . Because Silverleaf already had relinquished possession through the escrow established in the LSA, Wakefield could not have taken possession in any meaningful way, regardless of its agreements with Silverleaf and Metro.

Aplt. App., Vol. 4 at 1180-81.

## CONCLUSION

We agree with the district court that State Capital established its priority as purchaser of the WMLD over Wakefield's security interest. The judgment of the district court is therefore affirmed.

Entered for the Court

Mary Beck Briscoe
Chief Judge

- 15 -