2026 UT App 56

# THE UTAH COURT OF APPEALS

PCVI LLC, 1000 EAST HOLMSTEAD RANCH LLC,
HOLMSTEAD RANCH RESORT, LLC, AND UTAH TH LLC,
Appellants,
*v.*
PUOY K. PREMSRIRUT, PUOY K. PREMSRIRUT ESQ. INC.,
AND BROWN BROWN & PREMSRIRUT,
Appellees.

Opinion
No. 20241227-CA
Filed April 16, 2026

Fifth District Court, St. George Department
The Honorable Eric Gentry
No. 220500527

Alex B. Leeman, Alan S. Mouritsen,
Vivian Lee Thoreen, and Lydia Lee Lockett,
Attorneys for Appellants

Michael F. Skolnick, Matthew S. Thomas, and
Joseph P. Garin, Attorneys for Appellees

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES RYAN M. HARRIS and AMY J. OLIVER concurred.

TENNEY, Judge:

¶1　In July 2020, entrepreneur Anthony Hsieh signed a power of attorney (the Power of Attorney) that authorized Connie Yeh to act on his behalf. A few weeks later, Hsieh signed a document that designated Yeh as the authorized agent for PCVI, LLC (PCVI), which was a company that Hsieh had recently formed.

¶2　In August 2020, Yeh signed a retainer agreement (the Agreement) with the Nevada law firm Brown Brown & Premsrirut (the Firm), whereby the Firm was retained to represent PCVI, Hsieh, and "their respective affiliates." The

Agreement contained two forum selection clauses that required the parties to litigate any future disputes in Nevada. Puoy Premsrirut was one of the attorneys from the Firm. Acting as the attorney for Hsieh, Premsrirut soon purchased a resort in southern Utah and formed several entities to facilitate that transaction.

¶3     Hsieh struggled with substance abuse throughout 2020, and he died in November of that year. After his death, PCVI and three related entities filed a legal malpractice action in Utah against the Firm and Premsrirut. The defendants later filed a motion to dismiss for improper venue, citing the forum selection clauses from the Agreement. Over the plaintiffs' opposition, the district court granted that motion. The plaintiffs now appeal. For the reasons set forth below, we reverse one aspect of the dismissal order, affirm several others, and remand for further proceedings consistent with this opinion.[1]

---

1. As will be discussed below, some of the issues on appeal relate to PCVI and the three entities together, while some of the issues only relate to the three entities. Moving forward, we'll refer to the plaintiffs collectively as "the Plaintiffs," and where warranted, we'll refer to the three entities as "the Non-Signatory Plaintiffs." As will be discussed, the defendants include both the Firm and Premsrirut. We'll refer to them collectively as "the Defendants."

BACKGROUND[2]

*Underlying Facts*

¶4    Hsieh was a successful entrepreneur and businessman. Among other things, he was the former CEO of Zappos, which is a leading online retailer. Although Hsieh was a Nevada resident and spent much of his professional career there, he owned a home in Park City and lived there during the events relevant to this appeal.

¶5    On July 18, 2020, Hsieh executed the Power of Attorney, and this document gave Yeh authority to make a large number of specified decisions on Hsieh's behalf. These included various financial decisions, as well as decisions regarding the "Operation of Entit[ies] or Business[es]" and "Legal Affairs, Claims and Litigation."[3]

¶6    On July 21, Yeh formed PCVI on behalf of Hsieh. PCVI's organizing document said that its purpose was the "[m]anagement of businesses." Hsieh was listed as the sole member of the organization. On August 5, Hsieh signed another

---

2. This appeal is from the district court's decision to grant a motion to dismiss for improper venue. In reviewing such a motion, "we view the facts and construe the complaint in the light most favorable to the plaintiff and indulge all reasonable inferences" in the plaintiff's favor. *Prows v. Pinpoint Retail Sys., Inc.*, 868 P.2d 809, 810 (Utah 1993) (quotation simplified).

3. To provide some context for this, we note that according to some documents filed in this case, Yeh was Hsieh's cousin, was a Wharton Business School graduate, and had been one of Hsieh's financial advisors for many years.

document (the Consent) designating Yeh as the "authorized agent" of PCVI.

¶7    On August 12, Yeh signed the Agreement—which, as indicated above, was with the Firm. The Agreement stated that Premsrirut would "be the attorney primarily responsible" for the retained work. The Agreement said that the Firm and Premsrirut were being retained to "represent Tony Hsieh (in his individual capacity), PCVI, LLC, (the 'Company') . . . and their respective affiliates, as well as such other entities or persons as mutually agreed by the parties," and it then specified that "the Company and the foregoing collectively" would be "referred to" in the Agreement "as the '*Client*.'" The Agreement said that the Firm and Premsrirut would provide "legal services," which included the "provision of real estate," "corporate and contractual legal services," and oversight of "all legal affairs of Client as directed." In exchange for these services, the Firm would receive an annual retainer of over $2 million.

¶8    The Agreement contained two forum selection clauses that are central to the issues raised on appeal. The first forum selection clause was included under a heading titled "GENERAL PROVISIONS," and we'll refer to it as the General Clause. This clause stated,

> This Agreement will be governed by and construed in accordance with the laws of the United States and the State of Nevada applied to agreements entered into and to be performed entirely within Nevada between Nevada residents. Firm and Company further agree that for purposes of venue and jurisdiction, that any disputes, issues, enforcement and/or all other matters concerning the Agreement will be determined in Clark County, State of Nevada, United States of America. The parties expressly waive any other jurisdiction to which they

might be entitled as a result of their present or future domicile or for any other reason.

¶9    The second forum selection clause was included under a heading titled "CLIENT DUTIES AND RESPONSIBILITIES," and we'll refer to it as the Litigation Clause. This clause stated, "Any litigation or other proceeding brought in connection with or as a result of the Firm's representation of the Client must be commenced and maintained only in a court of proper jurisdiction and venue in the State of Nevada."

¶10    In September, Premsrirut formed Tony Utah, LLC—later renamed Utah TH, LLC—with Hsieh listed as the sole "member[]/manager[]." In October, Premsrirut formed 1000 East Holmstead Ranch, LLC, with Utah TH, LLC listed as the sole "member[]/manager[]."

¶11    In late October, Premsrirut directed and oversaw 1000 East Holmstead Ranch, LLC's acquisition of the Holmstead Ranch—a "dude ranch resort" in southern Utah—for $25 million. In conjunction with this purchase, Hsieh acquired 100% of the membership interest of Holmstead Ranch Resort, LLC, an organization that had been formed by the former owner of the ranch. The purchase agreement was signed by Yeh as the manager of 1000 East Holmstead Ranch, LLC on October 21, and the purchase of the Holmstead Ranch closed on October 30.[4]

¶12    Hsieh died in November 2020. Hsieh's father, Richard Hsieh, was the sole administrator of Hsieh's estate.

---

4. The three entities we've referred to in this paragraph—(1) Utah TH, LLC; (2) 1000 East Holmstead Ranch, LLC; and (3) Holmstead Ranch Resort, LLC—are the entities we've referred to collectively as the Non-Signatory Plaintiffs.

*The Amended Complaint*

¶13 The Plaintiffs filed suit against the Defendants in August 2022. The complaint was filed in Washington County, Utah, and it asserted that venue was proper there because "the transactions and representations at issue in this lawsuit occurred, at least in part, there" and because "the real estate at issue is located there."

¶14 In an amended complaint that was filed in March 2023, the Plaintiffs asserted claims (1) alleging legal malpractice and (2) asking for formation of a constructive trust regarding ownership of the Holmstead Ranch. In support of the legal malpractice claim, the Plaintiffs asserted that the Defendants had provided negligent legal assistance relating to the purchase of the Holmstead Ranch (including by, among other things, failing to perform due diligence on the project), thereby causing the ranch to be overvalued by around $7 million. The constructive trust claim piggybacked off the legal malpractice claim. There, the Plaintiffs asserted that the Defendants' legal malpractice had resulted in the "Plaintiffs" now "possess[ing] and bear[ing] the liabilities of owning the Holmstead Ranch." The Plaintiffs asked the court to enter orders under which Hsieh's estate would hold title to the Holmstead Ranch "in constructive trust for" the Firm, with the Firm being "ordered to take possession of the property and return the acquisition price" to the estate.[5]

---

5. It's not entirely clear to us from the pleadings or the appellate briefing why the Plaintiffs believe that the Defendants committed malpractice against PCVI or how PCVI has been damaged. As indicated, the documents presented to the district court show that (1) Hsieh (not PCVI) was the sole "member/manager" of Utah TH, LLC; (2) Utah TH, LLC was the sole "member/manager" of 1000 East Holmstead Ranch, LLC; and (3) 1000 East Holmstead Ranch,

(continued…)

¶15    In the amended complaint, the Plaintiffs also alleged that Hsieh lacked the capacity to agree to the Power of Attorney or, later, the Agreement. In doing so, the Plaintiffs presented a series of allegations that began with events from the late fall of 2019. According to the Plaintiffs, "[b]etween November 2019 and February 2020, [Hsieh] was under the influence of Ketamine and consequently suffered from disorganized delusional thinking and delusions of grandeur, resulting in erratic, nonsensical, and destructive behavior." The Plaintiffs alleged that during this period, Hsieh became "convinced that all humans were living in a simulation created by artificial intelligence," and they further alleged that he believed he could "'bio hack' his body to eliminate the need to urinate or sleep, and that his use of Ketamine would enable him to grow an additional two inches."

¶16    The Plaintiffs then alleged that Hsieh's substance abuse problems caused him to check into a rehabilitation facility in February 2020, where "members of the treatment staff were immediately concerned about [Hsieh's] psychiatric state" because he was "manic [and] exhibited delusions of grandeur and substance-induced psychosis." The Plaintiffs alleged that Hsieh checked himself out of the facility after only 14 days, and they further alleged that "his medical providers expressed concern that his disorganized thinking and delusions would continue if he resumed his substance abuse."

¶17    The Plaintiffs alleged that following Hsieh's February stay at the rehabilitation center, Hsieh "continued abusing hallucinogenic and dissociative substances, including nitrous oxide." They alleged that this abuse "fundamentally destroyed

LLC purchased the Holmstead Ranch. Regardless, the issues before us only concern the enforceability of the forum selection clauses, and the parties have not yet litigated questions of liability or damages at all, let alone relating to PCVI in particular.

[Hsieh's] ability to exercise reasonable diligence and judgment" and that his problems (both mentally and with respect to substances) "rendered him vulnerable to those seeking to take advantage of him."

¶18 The Plaintiffs then alleged that in "June 2020," Hsieh's "erratic behaviors and delusional thinking" reached a "fever pitch" during a bus trip that he took to Montana with friends, wherein Hsieh experienced "multiple psychotic episodes" that "culminated in [his] hospitalization" upon his return to his home in Park City, Utah. The Plaintiffs alleged that law enforcement officers who transported Hsieh to the hospital told medical providers that Hsieh's house was "completely trashed" and that Hsieh was "doing a lot of damage to it internally." The Plaintiffs alleged that the "interior of [Hsieh's] house contained broken glass, dog feces, rotten food, and melted wax from the candles [Hsieh] used to replace electricity at his house," and they alleged that Hsieh's burning candles "caused fire alarms to regularly sound in the middle of the night." They alleged that records from his ensuing hospitalization "state[d] that [Hsieh] had a very altered mental status."

¶19 The Plaintiffs alleged that after this hospitalization, Hsieh's abuse of nitrous oxide became more extreme, and they alleged that in July, Hsieh "was consuming nitrous oxide continuously every single day." They alleged that in the middle of that month, Hsieh's "longtime general counsel departed, describing [Hsieh's] situation as an approaching freight train she could not stop but which she did not want to enable."

¶20 The Plaintiffs then specifically alleged that it was "against this backdrop" that Hsieh had executed the Power of Attorney naming Yeh as his "attorney-in-fact."[6] The Plaintiffs alleged that

---

6. As noted above, Hsieh signed that document on July 18, 2020.

due to his deteriorating mental health and substance abuse problems, Hsieh "was unable to recognize that he was being exploited or appreciate the consequences of many of his actions," and they further alleged that he was "incapable of exercising appropriate judgment when it came to his physical safety, mental health, and financial well-being." In paragraph 48 of the amended complaint, the Plaintiffs specifically asserted that Hsieh "did not have the ability to understand the nature or consequences of his actions at the time [the Agreement] was signed, or at the time that Yeh purportedly obtained the alleged authority to act on [Hsieh's] behalf."

*The Defendants' Motion to Dismiss for Improper Venue*

¶21     In February 2024, the Defendants filed a motion to dismiss for improper venue pursuant to rule 12(b)(3) of the Utah Rules of Civil Procedure. At the outset of this motion, the Defendants acknowledged (while "strongly deny[ing]") the various allegations from the amended complaint, but they then asserted that, pursuant to the two forum selection clauses in the Agreement, the Plaintiffs were required to litigate this case in Nevada. At the close of their motion, the Defendants made the following request:

> [I]f this Court is disinclined to grant outright dismissal of the [amended complaint] based on improper forum, the Court should stay the case as to all issues except those pertaining to enforceability of the [Agreement's] forum selection provisions, permit related discovery and then conduct an evidentiary hearing to determine whether the [Agreement's] forum selection provisions must be enforced.

¶22 The Plaintiffs responded by filing a written opposition to the motion to dismiss, wherein they raised several arguments that are relevant to this appeal.

¶23 **Incapacity.** First, the Plaintiffs argued that the forum selection clauses were not enforceable against any of the Plaintiffs because the Agreement was "obtained through unconscionable means." This was so, according to the Plaintiffs, because Hsieh was incapacitated when "the Power of Attorney . . . was signed."[7] In support of their opposition, the Plaintiffs attached several thousand pages of transcripts and documents as an "[o]ffer of [p]roof." These pages included text messages, emails, police reports, medical records, financial records, and expert opinions, as well as portions of depositions that had been taken of Hsieh's friends and colleagues in other related cases.[8]

---

7. The Plaintiffs further asserted that Hsieh was incapacitated on the day that the Agreement was signed and at the time the Holmstead Ranch was acquired. But as indicated above, Yeh signed the Agreement for Hsieh and PCVI, so the subsequent legal arguments focused largely on whether Hsieh was incapacitated when he signed the Power of Attorney on July 18. As the district court later put it in its ruling, based on the arguments presented to it, "only one date matters: July 18, 2020, the day . . . Hsieh executed" the Power of Attorney.

8. The district court had not yet issued any discovery orders in this case at the time that either the motion to dismiss or the Plaintiffs' opposition was filed. Indeed, as explained below, the court has never issued such orders. That said, there had already been litigation in other cases involving many of these same parties, and it seems that the deposition transcripts we'll discuss here came from those cases.

¶24 The opposition memorandum and the documents that were filed with the offer of proof provided extensive details about the final months of Hsieh's life. Since these details drive much of our analysis below, we recount just some of the many allegations here:

- The Plaintiffs cited prior testimony from various friends who had visited Hsieh in May and June of 2020, wherein these friends described Hsieh's manic and delusional behavior during those months. This testimony included assertions that Hsieh had lost considerable weight, that he refused to wear a shirt or shoes, that he told friends he "didn't have to urinate anymore and his body recycled his urine," and that he believed he could "solve and cure COVID."

- These friends also provided more details about the Montana bus trip that had been referenced in the amended complaint, noting that this trip had occurred on June 27 and 28. The friends said that Hsieh left for the trip wearing only underwear. They described Hsieh as "high energy, ranting, manic," and "frothing at the mouth" during the trip. At one point, certain friends found Hsieh in the shower of the bus spreading feces on himself to "reabsorb the minerals in [his] body." At another point, Hsieh apparently believed there was an active shooter on the bus, which caused him to begin physically destroying the bus. The friends also said that Hsieh offered to pay everyone on the bus $1 million to enter a suicide pact with him based on his belief that he could light the bus on fire and that it wouldn't matter because they were living in an "illusion" like in "the Matrix." The friends said that Hsieh left the trip early and that once he was back in Park City, he flooded his home by turning on all the water.

- The Plaintiffs attached documents showing that on June 30, which was after Hsieh had returned home from the trip, some of Hsieh's friends contacted police and asked them to conduct a welfare check. Documents showed that responding officers took Hsieh to an emergency room because "they did not feel like he was safe at home taking care of himself [in] his altered state." While at the hospital, Hsieh reported that "he could stop his heart at will and could do it with his mind." In the medical records from that visit, the treating emergency room physician reported that Hsieh was "agitated and hallucinatory" as a result of the "illicit substances he abused." Documents showed that Hsieh was discharged the same day with no specified follow-up care.

- The Plaintiffs attached documents showing that after Hsieh's release from the hospital, he had a Zoom call with one particular friend (Friend One) in early July 2020 in which Hsieh introduced Friend One to a "$100 million opportunity." Friend One testified that the business plan was "not reasonable or rational," describing it as "gibberish."

- The Plaintiffs attached deposition transcripts showing that another friend and sometime business partner of Hsieh's (Friend Two) was with Hsieh on a fishing trip on July 17. Friend Two testified that while the two were fishing with some others, Hsieh made the group return to the dock twice because he was "in the midst of a marriage proposal" to an assistant, but in Friend Two's eyes, this assistant appeared to be "embarrassed" and "just trying to deal with the situation at hand." Friend Two said that once they were on the boat, Hsieh "had a hard time sitting still" and was "fidgety." Without any apparent reason for doing so, Hsieh tried to create a "hang glider"—pulling out everything he could find on the boat until Friend Two told him to stop, at

which point Hsieh became irritated. Friend Two said he "had never seen that behavior from [Hsieh] prior to 2020." Friend Two further said that Hsieh was "very on edge and high strung," and Friend Two recalled "wondering if [Hsieh had] taken something that day." Friend Two thought that, at that time, Hsieh was not "in a good place to be doing multimillion dollar deals."

- The Plaintiffs attached deposition transcripts showing that Friend One was concerned about Hsieh after the aforementioned Zoom call, so Friend One traveled to Park City to check on him. Friend One arrived in Park City on July 18 (which, again, was the day on which Hsieh signed the Power of Attorney), but Friend One did not see Hsieh until the next morning. Upon arriving in Park City, Friend One checked with Hsieh's assistants to try and arrange a meeting with Hsieh, but they informed him that Hsieh was "out of his mind" and that Friend One shouldn't "worry about it, because tomorrow he won't remember seeing you anyway." When Friend One met with Hsieh the next day, Hsieh was "uncharacteristically angry," "really aggressive," and "ranting." Friend One also said Hsieh was "[e]maciated" and "dirty."

- Friend One said that he saw "hundreds" of "little shots of nitrous oxide" in Hsieh's bedroom. At one point during this trip, Friend One and Hsieh went to Main Street in Park City, and while they were there, Hsieh wore no shoes and carried a backpack with a "mechanism that allowed him to do" nitrous oxide shots. Friend One said Hsieh used nitrous oxide "nonstop."

- The attached documents showed that Hsieh's nitrous oxide abuse continued through late July and early August 2020. Friends said that during this time, Hsieh only met with people in a canoe in the middle of a pond, and they further

showed that while on the canoe, Hsieh had "a bucket of nitrous cannisters" and a "contraption" that allowed him to "constantly" use them. They said that Hsieh only wore underwear at this point and was "covered in wax," as if he had been "melting wax on his body."

• The Plaintiffs' documents showed that Hsieh's parents hired an interventionist who went to Hsieh's house on August 4, "based on collective concern over [Hsieh's] welfare and information that a considerable amount of drugs had been delivered to [Hsieh's] home on August 2, 2020." A friend recalled that the interventionist was turned away by Premsrirut, who was at Hsieh's home that day meeting with him.

• On August 5, Dr. Michael Kagen was hired to provide a medical assessment of Hsieh. Dr. Kagen reported seeing "hundreds of canisters" of nitrous oxide around Hsieh's home, and he later opined that Hsieh was "likely high on some kind of drug and likely incapacitated and not competent to make decisions at that time."

• The Plaintiffs' documents showed that Hsieh's condition continued to deteriorate in the ensuing weeks and months. Documents showed that while Premsrirut was working on acquiring the Holmstead Ranch, she wrote to Hsieh's financial team saying that she would like to "halt" new business until she was confident about Hsieh's "condition and capacity."

• Documents showed that on October 24, Hsieh suffered a psychotic break, destroyed his home, and passed out. On October 29, Hsieh was taken to the emergency room after he stated that he didn't "know what's real and what's not" and suggested that he thought he was living in a simulation.

- Hsieh died on November 27, after he was found unresponsive in a house fire.

- Finally, the Plaintiffs attached a report from Dr. Carolina Klein. Dr. Klein said in her report that she was a licensed physician and psychiatrist who was certified by the American Board of Preventive Medicine in Addiction Psychiatry and had treated patients with severe mental illness in multiple settings. After reviewing Hsieh's medical and mental health history, various legal documents, deposition transcripts, video recordings of Hsieh, and the law surrounding legal capacity, Dr. Klein stated that in her opinion, "to a reasonable degree of medical certainty," the "current evidence shows sufficient and in fact ample merit for a finding of impaired mental capacity to make contractual and financial decisions due to a mental disease or defect, and that this mental disease or defect rendered [Hsieh] a highly vulnerable individual to undue influence." Dr. Klein opined that Hsieh's medical history "showed evidence of both psychosis and mania." She also opined that Hsieh "lacked contractual and financial capacity" because of these conditions and that there was "no evidence to support that . . . Hsieh regained contractual or financial capacity at any time *from June 2020 until the time of his death in November of 2020*." (Emphasis added.)

¶25 **Unfair and Unreasonable.** Separate from their arguments about Hsieh's alleged incapacity, the Plaintiffs also argued that it would be unfair and unreasonable to enforce the forum selection clauses. This was so, according to the Plaintiffs, because the alleged legal malpractice had occurred in Utah and involved the acquisition of Utah property, so requiring the suit to occur in Nevada would run contrary to Utah's interest in resolving matters involving the practice of law. The Plaintiffs further argued that, consistent with the third argument we'll discuss

shortly, the forum selection clauses could only be enforced against PCVI, so the clauses would not dispose of the Non-Signatory Plaintiffs' claims, and the Plaintiffs also alleged that their constructive trust claim could only be brought in Utah. For these reasons, the Plaintiffs argued that it would be unfair and unreasonable to enforce these clauses against them.

¶26 **Non-Parties.** Finally, the Non-Signatory Plaintiffs asserted that the forum selection clauses were not binding on them because they were not parties to the Agreement. In their view, "the plain language" of the Agreement was "unambiguous" in that the forum selection clauses did "not apply to anyone other than PCVI." In support of this assertion, the Non-Signatory Plaintiffs pointed out that they "did not even exist at the time the . . . Agreement was entered into."

*The Defendants' Reply*

¶27 The Defendants filed a written reply to the Plaintiffs' opposition. There, the Defendants did not introduce any new facts regarding the incapacity issue. Instead, they asserted that the Plaintiffs' arguments about Hsieh's alleged incapacity were "conclusory" and "unsupported." The Defendants further argued that the "arguments and evidence offered by [the] Plaintiffs, while admittedly broad-ranging and sensational, fail[ed] to establish that [Hsieh] was incapacitated on July 18, 2020, the day he executed the [Power of Attorney]," and they claimed that without such evidence, the Power of Attorney was "valid." From this, they argued that "Yeh had the authority to act on [Hsieh's] behalf, including with respect to" signing the Agreement.

*The District Court's Order*

¶28 In October 2024, the district court issued a written decision granting the Defendants' motion to dismiss.

¶29    The court first addressed the question of whether Hsieh had capacity to sign the Power of Attorney. The court observed that the "validity" of the Agreement "depend[ed] on the . . . validity" of the Power of Attorney, and it then observed that the "validity" of the Power of Attorney "depend[ed] on whether [Hsieh] had the requisite mental capacity to designate [Yeh] as his" attorney-in-fact when he signed that document on July 18, 2020.

¶30    In the court's view, the task before it was to determine "whether [the] Plaintiffs ha[d] provided sufficient evidence to show that [Hsieh] lacked capacity at the time he executed the [Power of Attorney]." Turning to the evidence that had been presented by the Plaintiffs in their opposition, the court expressed its view that there was "surprisingly little evidence of [Hsieh's] capacity or lack thereof on July 18, 2020." While acknowledging that there was some evidence of Hsieh's "drug abuse," the court opined that Hsieh "could have been sober when signing the [P]ower of [A]ttorney, indicating that any impairment in his ability to receive and evaluate information was minimal, if not absent, at the time . . . he executed" the Power of Attorney. The court thus concluded that the "Plaintiffs' evidence as to [Hsieh's] alleged incapacity on July 18, 2020 [was] circumstantial, vague, and deficient."

¶31    The court acknowledged that the Plaintiffs had provided "opinions from medical professionals," which was an apparent reference to the reports from doctors Kagen and Klein. But the court concluded that these opinions also did not support the conclusion that Hsieh was incapacitated on July 18. This was so, in the court's view, because "those medical professionals were not qualified as experts, and, to the court's knowledge, did not have expertise in the relevant medical areas to opine on [Hsieh's] incapacity." The court further observed that Dr. Kagen had not

"visit[ed] with [Hsieh] until August—weeks after the [Power of Attorney] was executed."

¶32    Given all this, the court concluded that the Plaintiffs had not carried their burden of "show[ing] that [Hsieh] did not have the proper capacity on July 18."

¶33    The court next addressed the question of whether it would be "unfair or unreasonable" to enforce the forum selection clauses against the Plaintiffs. Here, the court opined that because "Clark County, Nevada is nearly adjacent to Washington County, Utah," which was where this case had been filed, the "burden of litigating in Clark County as opposed to Washington County is minimal." The court also observed that the Power of Attorney and the Agreement "were negotiated and signed in Nevada." As a result, even though the Holmstead Ranch is located in Utah, the court concluded that it would not be unfair or unreasonable to enforce the provisions requiring litigation to occur in Nevada.

¶34    Finally, the court concluded that each of the Plaintiffs was bound by one of the forum selection clauses. The court pointed out that, on its face, the General Clause was binding on the "Company," which the Agreement defined as "PCVI, LLC." The court accordingly concluded that the General Clause was binding on PCVI but not on the Non-Signatory Plaintiffs. Turning to the Litigation Clause, the court pointed out that this clause was binding on "the Client," which the Agreement defined as PCVI, Hsieh, "and their respective affiliates." In the court's view, the Non-Signatory Plaintiffs each qualified as "affiliates" of Hsieh and PCVI and were therefore bound by this clause.

¶35    Because the court had now held that the forum selection clauses were enforceable generally, and because it had also held that each of the Plaintiffs was bound by at least one of them, the

court granted the Defendants' motion to dismiss the case for improper venue.

ISSUES AND STANDARDS OF REVIEW

¶36     On appeal, the Plaintiffs raise two challenges to the court's conclusion that the forum selection clauses were enforceable. First, they argue that they sufficiently pled and proved that Hsieh was incapacitated when he signed the Power of Attorney, and that the forum selection clauses were unenforceable as a result. Second, they argue that it would be unfair and unreasonable to enforce these clauses given the relative interests of Utah and Nevada. "A district court's decision to enforce a forum selection clause is reviewed for abuse of discretion." *Jacobsen Constr. Co. v. Teton Builders*, 2005 UT 4, ¶ 9, 106 P.3d 719. A district court "abuses its discretion in enforcing a forum selection clause when the clause is so unreasonable that its enforcement would be against both logic and the facts on the record." *Id.* (quotation simplified).

¶37     The Plaintiffs also challenge the court's conclusion that the Non-Signatory Plaintiffs were bound by the Litigation Clause. Appellate courts "review a district court's interpretation of a contract for correctness." *Sunstone Realty Partners X LLC v. Bodell Constr. Co.*, 2024 UT 9, ¶ 8, 545 P.3d 260 (quotation simplified).

ANALYSIS

I. Hsieh's Incapacity

¶38     The Plaintiffs first argue that it would be unfair or unreasonable to enforce the forum selection clauses from the Agreement because Hsieh lacked capacity to sign the Power of

Attorney, which was the document that gave Yeh authority to bind both Hsieh and PCVI to the terms of the Agreement.

¶39   The litigation below and the briefing on appeal have collectively suggested that there is some confusion about how and when a motion such as this one should be litigated. We accordingly first set forth our understanding of the state of the law in this area. From there, we apply that law to this case.

A.    State of the Law

¶40   After a plaintiff has filed a complaint, rule 12(b)(3) of the Utah Rules of Civil Procedure allows a defendant to file a motion to dismiss for "improper venue." If a defendant files such a motion, and if the resultant litigation is based on the pleadings alone, a district court should "view the facts and construe the complaint in the light most favorable to the plaintiff and indulge all reasonable inferences in his [or her] favor." *Prows v. Pinpoint Retail Sys., Inc.*, 868 P.2d 809, 810 (Utah 1993) (quotation simplified); *accord Energy Claims Ltd. v. Catalyst Inv. Group Ltd.*, 2014 UT 13, ¶ 46, 325 P.3d 70; *Coombs v. Juice Works Dev. Inc.*, 2003 UT App 388, n.2, 81 P.3d 769.

¶41   If a defendant intends to argue that the "factual allegations in a plaintiff's complaint are not true," however, then this "factual attack[]" would likely "require the introduction of materials outside the pleadings." *Salt Lake County v. State*, 2020 UT 27, ¶ 32, 466 P.3d 158. In some (if not most) cases, proper factual development on these issues would involve allowing the parties to conduct discovery. In *Coombs*, for example, the district court heard oral argument on the defendant's motion to dismiss, after which it decided to "allow[] limited discovery" on the issues relating to enforcement of a forum selection clause. 2003 UT App 388, ¶ 4. Following discovery, the defendant renewed the motion to dismiss, after which the court granted the motion based on its

conclusion that the plaintiffs "had not met their burden of establishing that the forum selection clause should not be enforced." *Id.*

¶42 The litigation in *Salt Lake Tribune Publishing Co. v. Memmott* proceeded similarly. 2001 UT 83, 40 P.3d 575. There, one of the defendants filed a motion to change venue based on a statutory venue provision that turned on the place at which the contractual obligation was to be performed. *See id.* ¶¶ 9–10. After the defendant filed this motion, the district court "allowed limited discovery related to [that] motion, including depositions," after which the court "conducted a hearing" and decided the motion. *Id.* ¶ 9.

¶43 In many cases, a motion to dismiss for improper venue is based on a forum selection clause. These cases have resulted in a line of appellate decisions that has produced a few rules that are applicable here. Our supreme court's decision in *Energy Claims* is one of the principal cases in this area. There, the supreme court "accepted the general principle that forum selection clauses are enforceable and can limit a court's jurisdiction." 2014 UT 13, ¶ 47. But the supreme court also held that, in some circumstances, the "parties' agreement as to the place of the action" will not be enforced. *Id.* (quotation simplified). In the supreme court's view, a plaintiff can defeat a motion to dismiss that's based on a forum selection clause if the plaintiff can show that "enforcement of the clause" would be "unfair or unreasonable, or that (1) the choice-of-forum provision was obtained by fraud, duress, the abuse of economic power, or other unconscionable means; or (2) the courts of the chosen state would be closed to the suit or would not handle it effectively or fairly." *Id.* (quotation simplified).

¶44 The supreme court held that in opposing a motion on such grounds, the plaintiff bears the burden of proof. *See id.* And the court also held that the plaintiff can make the requisite showing

by pointing to some infirmity with the contract as a whole, as opposed to being required to make a showing that is specific to the forum selection clause itself. *See id.* ¶¶ 49–52.

¶45 The supreme court also held that if a plaintiff intends to assert that a forum selection clause is "unenforceable due to fraud, the plaintiff must then satisfy rule 9(b) of the Utah Rules of Civil Procedure," under which "the circumstances constituting fraud" must be "stated with particularity in the complaint."[9] *Id.* ¶ 54 (quotation simplified). According to the supreme court, while the rule speaks of "fraud," this requirement extends to an allegation that a forum selection clause was "obtained through improper means," was the product of "overreaching generally," or was obtained through "unconscionable means." *Id.* ¶ 49 n.70 (quotation simplified); *accord Bad Ass Coffee Co. of Haw., Inc. v. Royal Aloha Int'l, LLC*, 2015 UT App 303, ¶ 12 n.6, 365 P.3d 161. Moreover, to satisfy the particularity requirement, the court held that the plaintiff's complaint must include a "sufficiently clear and specific description of the facts" underlying the plaintiff's assertions as to why the forum selection clause should be deemed unenforceable. *Energy Claims*, 2014 UT 13, ¶ 54.[10]

---

9. The Utah Rules of Civil Procedure were amended in 2016 after *Energy Claims Ltd. v. Catalyst Investment Group Ltd.*, 2014 UT 13, 325 P.3d 70, was issued. The rule 9(b) referenced in *Energy Claims* is located in rule 9(c) of the current rules.

10. If a situation arises in which a plaintiff somehow did not contemplate that a forum selection clause would be invoked, it seems that one means for satisfying the pleading-with-particularity requirement would be for the plaintiff to file an amended complaint in which the plaintiff now sets forth allegations regarding the alleged infirmity. Something similar

(continued…)

¶46 But this all leads to a potential problem. As noted, forum selection clauses can be enforceable, and the "parties' agreement as to the place of the action will be given effect" unless the plaintiffs have shown that it should not. *Id.* ¶ 47 (quotation simplified). In this sense, when there is a valid forum selection clause, the defendant should be able to enjoy the agreed-upon benefit of *not* having to litigate the case in some other forum. In *Energy Claims*, however, our supreme court recognized that since it had now held that a plaintiff can attack the enforceability of a forum selection clause by making arguments about the formation of the broader contract, this holding could lead to a situation in which issues surrounding the enforceability of the forum selection clause are tied up with litigation about the overall contract. *See id.* ¶ 55. In a sense, this might subvert the apparent purpose of the forum selection clause, which is to allow the party to contractually control where litigation occurs.

---

seems to have occurred in *Prows.* There, after the plaintiff sued a defendant in Utah, the defendant filed a motion to dismiss for improper venue, citing a forum selection clause. *See* 868 P.2d at 810. In response, the plaintiff filed an amended complaint that added additional defendants and allegations, and the plaintiff's opposition to the motion to dismiss for improper venue then turned, in part, on the presence of the additional defendants and on the plaintiff's new allegations. *See id.* at 812–13.

In *Bad Ass Coffee Co. of Hawaii, Inc. v. Royal Aloha International, LLC*, the appeal turned on whether the plaintiff had sufficiently pleaded fraud in the complaint. 2015 UT App 303, 365 P.3d 161. On appeal, we concluded that the district court had used the wrong legal standard when ruling on the motion to dismiss, so we remanded with instructions for the court to assess that motion under the correct standard. *Id.* ¶ 12. We then suggested that in doing so, the district court should, "if appropriate, give [the plaintiff] an opportunity to amend its complaint." *Id.*

¶47    Even so, however, the supreme court held that "this may nevertheless be necessary." *Id.* But in recognition of the defendant's interests, the supreme court pointed to two things that, in its view, can help prevent plaintiffs from "freely dodg[ing] forum selection clauses." *Id.* ¶ 53. First, as indicated, the supreme court reiterated that a plaintiff must "plead fraud" or the other circumstances that would render the clause unenforceable "with particularity." *Id.* The supreme court thus contemplated that this requirement alone can help curb potential excesses. And second, the supreme court recognized that when a district court orders discovery on issues relating to the enforceability of a forum selection clause, the district court retains "the discretion to hold an evidentiary hearing on the allegations of fraud or overreaching before deciding whether to enforce the challenged forum selection clause." *Id.* ¶ 55. In this sense, the supreme court contemplated that the district court's discretion over discovery would allow it to decide the forum selection issues early on, thereby potentially sparing a defendant from having to litigate the full case until those issues are resolved.

¶48    Pulling all of these principles together, we thus clarify that when a defendant files a motion to dismiss based on improper venue, the district court's ruling on the motion can essentially take one of two forms. First, if the ruling is based on the pleadings alone, the court should view the facts and allegations in the light most favorable to the plaintiff and then determine whether the pleadings alone establish that venue is or is not proper. Second, if the motion to dismiss challenges the facts set forth in the complaint, or, in our view, if the plaintiff's opposition raises additional factual issues relating to enforceability of the clause, the district court then "has the discretion to hold an evidentiary hearing" to make relevant factual findings "before deciding

whether to enforce the challenged forum selection clause." *Bad Ass Coffee Co.*, 2015 UT App 303, ¶ 10 (quotation simplified).[11]

¶49 But with respect to a ruling that moves beyond the pleadings, we now offer an additional point of clarification: namely, it seems to us that in such a circumstance, the plaintiff would no longer be entitled to have the facts viewed in the light most favorable to its position. Again, *Energy Claims* stressed that the "party opposing enforcement of the clause bears the burden of proving" that there is some reason not to enforce the clause. 2014 UT 13, ¶ 47 (quotation simplified); *see also id.* ¶ 47 n.67 (holding that if a forum selection clause would otherwise apply, the plaintiffs are "barred from bringing suit" elsewhere "unless they can prove one of the listed" reasons under which a clause is unenforceable). Notions of "proof" of course contemplate resolution of factual questions. And as illustrated by this case, many of the kinds of arguments raised by plaintiffs in opposition to motions to enforce a forum selection clause will indeed turn on factual questions.

---

11. While the cases cited above have spoken of the district court's discretion as to the "evidentiary hearing," we think it clear enough that this discretion would extend to discovery on the enforceability issues more generally. In other words, to forestall the potential problems identified in *Energy Claims*, a district court would have discretion as to how and when discovery should be conducted on the enforceability issues as opposed to discovery on the broader case. In many cases, we would expect that the district court will choose to order expeditious and, insofar as it's possible, limited discovery that's confined to the forum selection issues, thereby allowing those issues to be decided first before forcing the defendants to litigate the entire case in a forum outside the one that was agreed to in the forum selection clause.

¶50 But if a district court chooses to take evidence and then decide contested factual questions, it would subvert the purposes and effect of the plaintiff's burden to hold that the plaintiff is somehow still entitled to have the facts automatically viewed in its favor. In this sense, we now clarify that once the motion has moved past the plaintiff's pleadings and has now been subjected to factual development, the question is no longer whether the plaintiff has *alleged* enough to survive a motion to dismiss. Rather, the question then becomes whether the plaintiff has *proven* enough to then persuade the court that the clause should not be enforced.

B.     This Case

¶51 Against this backdrop, we now consider the ruling at issue. As noted, the Plaintiffs argued that the forum selection clauses were unenforceable due to Hsieh's incapacity to sign the Power of Attorney.

¶52 Under our caselaw, "parties are generally presumed to be competent to enter into a contract." *Wittingham, LLC v. TNE Ltd. P'ship*, 2020 UT 49, ¶ 58, 469 P.3d 1035.

> This presumption can be rebutted only if the party asserting incompetence can show, by clear and convincing evidence, that an individual's mental facilities were so deficient or impaired that there was not sufficient power to comprehend the subject of the contract, its nature and its probable consequences, and to act with discretion in relation thereto, or with relation to the ordinary affairs of life.

*Id.* (quotation simplified). An individual's capacity to contract is "measured at the time of the execution of the contract," *id.* (quotation simplified), and "[l]ess weight is given to remote

transactions and conversations," *Anderson v. Thomas*, 159 P.2d 142, 144 (Utah 1945). Thus, to prevail on an incapacity claim, "a party typically must submit testimony from witnesses who observed the individual at or near the time of the transaction." *Wittingham*, 2020 UT 49, ¶ 58. In one of Utah's earliest cases regarding this issue, our supreme court noted that "[n]o general or hard and fast rule which shall govern or control in all cases can be promulgated, but every case must, to a very large extent, be determined upon the facts and circumstances present in that case." *Hatch v. Hatch*, 148 P. 433, 438 (Utah 1914). [12]

---

12. Utah has adopted the Uniform Power of Attorney Act, which comprises Utah Code sections 75A-2-101 through 75A-2-403. Under one provision of this act,

> A principal may sign a power of attorney, or direct another individual in the principal's conscious presence to sign the principal's name on the power of attorney, if . . . the principal has sufficient mental capacity at the time that the power of attorney is executed to understand that the principal is appointing an agent to handle the principal's financial affairs.

Utah Code § 75A-2-105(1)(a). "Incapacity" is defined in that act, in relevant part, as "the inability of an individual to manage property or business affairs because the individual . . . has an impairment in the ability to receive and evaluate information or make or communicate decisions even with the use of technological assistance." *Id.* § 75A-2-102(8)(a).

The key phrase from the statute seems to be its reference to the person's ability to "receive and evaluate information." *Id.* We don't regard this as supplanting or even being meaningfully different from the general capacity standard set forth above, which, as noted, turns on the person's ability "to comprehend the

(continued…)

¶53 As an initial matter, we note that the parties in this appeal have each made various arguments about the pleadings. Of particular note, they've disputed whether the Plaintiffs pleaded incapacity with sufficient particularity.

¶54 But the district court's ruling wasn't based on the pleadings. Rather, at the outset of the ruling, the court explained that it thought its task was to determine "whether [the] Plaintiffs ha[d] *provided sufficient evidence* to show that [Hsieh] lacked capacity at the time he executed" the Power of Attorney. (Emphasis added.) And the court then went on to evaluate the quality and sufficiency of the evidence submitted by the Plaintiffs, and almost all (if not all) of that evidence would clearly qualify as "extra-pleading material." *Salt Lake County*, 2020 UT 27, ¶ 32. Thus, we don't understand the district court to have ruled on the Defendants' motion based on the pleadings. Rather, we understand the court to have concluded that, as a factual matter, the Plaintiffs had not satisfied their burden of proof.[13]

---

subject of the contract, its nature and its probable consequences, and to act with discretion in relation thereto, or with relation to the ordinary affairs of life." *Wittingham, LLC v. TNE Ltd. P'ship*, 2020 UT 49, ¶ 58, 469 P.3d 1035 (quotation simplified). To the extent that there is any conceptual daylight between the two standards, the parties in this appeal have not pointed us to it.

13. If the parties were somehow correct about the nature of the ruling, we would have no difficulty concluding that the Plaintiffs pleaded enough, in their amended complaint, to show Hsieh's incapacity. Again, at that stage, the court would be required to accept their allegations as true. *See Prows*, 868 P.2d at 810. And in paragraph 48 of the amended complaint, the Plaintiffs specifically asserted that Hsieh "did not have the ability to understand the

(continued…)

¶55    But in reviewing that ruling now, we note several things: (1) the district court did not issue any discovery orders allowing the parties to conduct discovery on the incapacity claim; (2) after the Plaintiffs proffered a host of factual assertions in their opposition, the Defendants did not dispute the Plaintiffs' assertions of fact in their reply memorandum, instead arguing, for purposes of this motion, that the Defendants should still prevail because the Plaintiffs had not offered the right kind of proof; and (3) in its ruling, the district court did not purport to resolve any factual disputes against the Plaintiffs. Rather, consistent with the approach taken by the Defendants, the district court seems to have *accepted* the Plaintiffs' factual proffers as true, and the court then concluded that the Plaintiffs' proffers—even if true—were not sufficient to prove that Hsieh was incapacitated when he signed the Power of Attorney.

---

nature or consequences of his actions . . . at the time that Yeh purportedly obtained the alleged authority to act on [Hsieh's] behalf."

To the extent that the motion to dismiss was based on an alleged failure to plead this with particularity, we would likewise have no difficulty rejecting the Defendants' position. Again, the Plaintiffs were required to provide a "sufficiently clear and specific description of the facts" underlying their assertions as to why the forum selection clauses were unenforceable. *Energy Claims*, 2014 UT 13, ¶ 54. As detailed above, the Plaintiffs included, in their amended complaint, a host of allegations setting forth their view of Hsieh being incapacitated in the months and even days leading up to him signing the Power of Attorney, including specific allegations about both his drug use and his psychotic behavior. On this front, they did more than enough to explain, with particularity, the basis for their assertion in paragraph 48 that Hsieh was incapacitated.

¶56 Against that framing, and on the state of the Plaintiffs' uncontested factual proffer, we conclude that, contrary to the view of the district court, the Plaintiffs did sufficiently establish that on the day that Hsieh signed the Power of Attorney, his "mental facilities were so deficient or impaired that there was not sufficient power to comprehend the subject of the contract, its nature and its probable consequences, and to act with discretion in relation thereto, or with relation to the ordinary affairs of life." *Wittingham*, 2020 UT 49, ¶ 58 (quotation simplified).

¶57 We recounted the Plaintiffs' various proffers at some length in the Background above, and we need not repeat all of those proffers here. But in short, the Plaintiffs proffered specific evidence showing that in the months, weeks, and even days leading up to Hsieh signing the Power of Attorney, Hsieh was beset by sustained and ongoing delusional thinking that clearly impaired his mental faculties. The Plaintiffs proffered evidence showing that some (if not many) of his problems were attributable to his ongoing drug abuse. The Plaintiffs proffered evidence showing that neither his delusional thinking nor his drug abuse had abated at the time he signed the Power of Attorney. And they proffered evidence showing that these problems then continued in the weeks and months after he signed the Power of Attorney and up through his death. And none of these facts were substantively contested by the Defendants.

¶58 Despite all this, the district court pointed to what it saw as two problems with the Plaintiffs' evidence.

¶59 The first had to do with timing. The court expressed its opinion that there was "surprisingly little evidence of [Hsieh's] capacity or lack thereof on July 18, 2020." In the court's view, even with the evidence of Hsieh's "drug abuse," Hsieh "could have been sober when signing the [P]ower of [A]ttorney."

¶60   As a conceptual matter, we disagree with the court's apparent conclusion that a party must provide proof that was taken on the exact day in question. The supreme court has held that "a party typically must submit testimony from witnesses who observed the individual *at or near the time of the transaction*." *Id.* ¶ 58 (emphasis added). And this makes sense. As with any other fact question, a factfinder in such cases can draw reasonable inferences. As a result, if a plaintiff has produced proof showing that the person in question was incapacitated on days or even over periods that were reasonably near the day in question, a factfinder could, depending on the circumstances, draw the inference that this evidence showed that the person was incapacitated on the day in question as well.

¶61   The lynchpin to such a determination, of course, is how close the proof is to the day that matters—and, under the circumstances, whether it's close enough to support the requested inference. In some past cases, for example, our supreme court was unpersuaded by proof about an individual's incapacity because it was too far removed. *See, e.g., Peterson v. Coca-Cola USA*, 2002 UT 42, ¶ 18, 48 P.3d 941 (concluding that evidence of the person's incompetence four years after the transaction was not sufficient to prove incapacity at the time of signing); *Walker v. United States Gen., Inc.*, 916 P.2d 903, 907 (Utah 1996) (rejecting the argument that an individual remained incapacitated as a result of impairment based on evidence taken when he was "very young").

¶62   But this is a far cry from the proof that was presented here. Again, the Plaintiffs' proffered evidence wasn't about just a few sporadic incidents that occurred in the distant past or distant future. Rather, their proffered evidence showed that Hsieh had sustained problems with delusional thinking and drugs over the course of several months before he signed the Power of Attorney, that these problems were severe enough to result in multiple

hospitalizations, and, of note, that they were persistent and ongoing.

¶63 And most importantly, the Plaintiffs did present evidence showing that these problems were present in the very weeks and days before and after Hsieh signed the Power of Attorney. As noted, they proffered evidence showing that in an encounter just a few weeks earlier, Hsieh proposed a business plan to Friend One that was "not reasonable or rational." The Plaintiffs proffered evidence showing that in an encounter between Friend Two and Hsieh on the day before he signed the Power of Attorney, Hsieh's behavior was so erratic that Friend Two wondered if Hsieh "[had] taken something that day" and thought that Hsieh was not "in a good place to be doing multimillion dollar deals." They proffered evidence showing that on the same day that Hsieh signed the Power of Attorney, Friend One was told by Hsieh's assistants that Hsieh was "out of his mind," and they presented evidence showing that when Friend One met with Hsieh the next day, Hsieh was "ranting," "[e]maciated," "dirty," and continuously taking nitrous oxide. As noted, other evidence showed that Hsieh's use of substances was part of the cause of his delusional thinking.

¶64 Beyond all that, the Plaintiffs produced a report from Dr. Kagen in which he said that on August 5 (approximately three weeks after Hsieh signed the Power of Attorney), he saw "hundreds of canisters" of nitrous oxide around Hsieh's home, and in which he then opined that Hsieh was "likely high on some kind of drug and likely incapacitated and not competent to make decisions at that time." And they also produced a report from Dr. Klein, wherein she opined that there was "no evidence to support that . . . Hsieh *regained* contractual or financial capacity at *any time from June 2020 until the time of his death in November of 2020.*" (Emphases added.)

¶65 Thus, contrary to the conclusions of the district court, there *was* evidence of things that occurred on dates that were on or reasonably near July 18 that showed that Hsieh was experiencing delusions and other mental problems that would plainly interfere with his decision-making capacity. We thus disagree with the court's conclusion that there was any material infirmity with respect to the temporal proximity of the Plaintiffs' evidence as related to the day Hsieh signed the Power of Attorney.

¶66 Second, we also disagree with the district court's decision to discount the reports produced by the Plaintiffs' medical witnesses. As noted, the court thought this evidence was not persuasive because "those medical professionals were not qualified as experts, and, to the court's knowledge, did not have expertise in the relevant medical areas to opine on [Hsieh's] incapacity."

¶67 But the Defendants did not file a motion asking the court to hold that the Plaintiffs' two medical witnesses were not sufficiently qualified pursuant to rule 702 of the Utah Rules of Evidence, nor did the court issue a general discovery order that would have allowed factual exploration of those qualifications. As a result, neither party has yet had the opportunity to weigh in on such issues, so it seems that the court's ruling about the alleged lack of qualifications of the medical witnesses was, at a minimum, premature.[14]

---

14. It is also worth noting that Dr. Klein indicated in her report that she was a licensed physician and psychiatrist who was certified by the American Board of Preventive Medicine in Addiction Psychiatry and had treated patients with severe mental illness in multiple settings. On their face, and at least prior to any

(continued…)

¶68  We also disagree with the court's concerns about the fact that neither of the two medical witnesses personally examined Hsieh on July 18. Again, Dr. Kagen personally examined him just a few weeks later, and we think those observations were sufficiently close in time to have some relevance. With respect to Dr. Klein, we note that under rule 703 of the Utah Rules of Evidence, "[a]n expert may base an opinion on facts or data in the case that the expert has been *made aware of* or personally observed." (Emphasis added.) "As a general principle, medical experts often rely on data provided by specialists from other fields, treating providers, or data obtained from imaging scans or diagnostic tests." *Smith v. Volkswagen SouthTowne, Inc.*, 2022 UT 29, ¶ 133, 513 P.3d 729 (quotation simplified). And it is thus well-established that an expert "may base his [or her] opinion on reports, writings or observations not in evidence which were made or compiled by others, so long as they are of a type reasonably relied upon by experts in that particular field." *State v. Clayton*, 646 P.2d 723, 726 (Utah 1982). Here, even though Dr. Klein did not evaluate Hsieh on the day that he signed the Power of Attorney, this doesn't mean that she could not opine on Hsieh's mental state based on observations from people who interacted with him during the relevant timeframe. As discussed, this is precisely what she did.

¶69  But in any event, even if there were an evidentiary problem with respect to either of the two medical reports, we still would not see this as a basis for granting the motion to dismiss. The district court pointed to no authority, and we're aware of none, holding that a party must produce a competent diagnosis from a medical expert to support an incapacity ruling. To the contrary, our supreme court in *Wittingham* held that "[e]xpert

---

discovery calling them into question, these assertions indicate that Dr. Klein does have the qualifications and expertise necessary to offer the opinions she offered.

testimony is not required in a competency proceeding. In fact, lay witness testimony may be more beneficial because it is more likely to provide direct evidence of an individual's mental state during the relevant time period—when the individual entered into the contract." 2020 UT 49, ¶ 65. And the supreme court further held that "a district court can rely solely on lay witness testimony when determining competency." *Id.*

¶70　This isn't to say that testimony from medical experts can't be admissible or wouldn't be helpful. But it is to say that it's not required. And for the reasons set forth above, we think the extensive evidence from people who interacted with Hsieh in the relevant period was more than enough to show that Hsieh was incapacitated on July 18.

¶71　As a final matter, we note that in their arguments on appeal, the Defendants point to a passage from the Plaintiffs' opposition to the motion to dismiss in which the Plaintiffs suggested that the district court need not hold an evidentiary hearing. From this, the Defendants argue that the Plaintiffs waived the right to request an evidentiary hearing regarding the factual questions related to Hsieh's incapacity.

¶72　But having reviewed the filing in question, we don't regard the Plaintiffs' statement as being as definitive as the Defendants suggest. In the passage in question, the Plaintiffs pointed out that the district court retained discretion as to whether to hold an evidentiary hearing, and they then asserted that in light of the evidence they had produced, such a hearing would be "unnecessary at this juncture." Having considered the matter here, it seems to us that the Plaintiffs' statements were about the timing and nature of discovery, but those statements, while perhaps inartful, were not anything that would constitute a binding waiver of the right to oppose the Defendants' motion to dismiss, which is what's ultimately at issue in this appeal.

¶73 In short, we conclude that in the amended complaint, the Plaintiffs sufficiently alleged that Hsieh was incapacitated on the day he signed the Power of Attorney. And we further conclude that on the state of the evidence before the district court, the Plaintiffs did carry their burden of proving that Hsieh lacked capacity to sign that document. Because of this, we conclude that the court exceeded its discretion in granting the motion to dismiss. Simply put, on the record before it, the court should have instead concluded that the Plaintiffs' opposition was sufficient to deny the motion.

¶74 But this doesn't end the matter. As noted above, the Defendants also included in their original motion to dismiss a request for discovery and an evidentiary hearing if the court were "disinclined to grant outright dismissal" of the amended complaint. While the district court was "inclined" to grant their request for outright dismissal (and indeed did), we've now reversed that decision. We therefore regard the Defendants' earlier request for discovery as now being revived and thus pending before the district court. We accordingly remand this case to the district court with instructions for it to consider the Defendants' request and issue such discovery orders on the incapacity issue as it deems appropriate.

## II. Unfair or Unreasonable

¶75 In their opposition memorandum, the Plaintiffs also argued that it would be "unfair or unreasonable" to enforce the forum selection clauses against them. The district court ruled

against the Plaintiffs on this front. The Plaintiffs challenge this ruling on appeal. But here, we agree with the district court.[15]

¶76    As noted, *Energy Claims* held that to prevail on such an argument, the plaintiff "bears the burden of proving that enforcing the clause is unfair or unreasonable." 2014 UT 13, ¶ 47 (quotation simplified). Here, the Plaintiffs advance four arguments as to why, in their view, it would be unfair or unreasonable to enforce the forum selection clauses against them.

¶77    First, the Plaintiffs suggest that it would be unfair to force them to litigate in Nevada because the alleged legal malpractice involved "multiple transactions in Utah[] for Utah clients" and caused "significant damage" to those "Utah clients." In this sense, we understand this to be something of an overarching unfairness argument based on the strength of the Utah ties to the claims.

¶78    But as the Defendants point out, there were ample other connections between this case, the parties, and Nevada. As discussed, the Firm itself is based in Nevada, and that is where

---

15. Given our decision to reverse on the incapacity issue, we could in theory choose not to address either this issue or the issue we address in Part III. But as indicated, the Defendants now have a pending request for discovery and further proceedings on the incapacity issue. In the meantime, these rationales could in theory provide an alternate path for denying the motion to dismiss the amended complaint. Insofar as the parties have already litigated them, the district court has already ruled on them, and the parties have fully briefed their arguments about them in this appeal, we think it appropriate to address them now. *See State v. Ogden*, 2018 UT 8, ¶ 49, 416 P.3d 1132 ("Although it is unnecessary to our decision, we retain the authority to reach issues when we believe our analysis could prove helpful on remand.").

Premsrirut is licensed to practice. Hsieh spent much of his professional career in Nevada (indeed, he had recently moved the headquarters of Zappos to Nevada), and while Hsieh apparently spent much of his time in Park City, he was a Nevada resident at the time of his death. Moreover, the probate proceedings for Hsieh's estate have proceeded in Nevada, and Hsieh's estate has filed several other related suits in Nevada courts. In light of all this, the Plaintiffs have not persuaded us that the Utah ties to this case are so disproportionate to the Nevada ties that the forum selection clauses can or should be rendered unenforceable as a result.

¶79 Second, the Plaintiffs argue that this case can only be litigated in Utah because it's up to Utah courts to "control the practice of law in this state." But the Firm in general and Premsrirut in particular are not being called to task for the unauthorized practice of law. Rather, they're being sued for legal malpractice.

¶80 At the time that the Agreement was negotiated, there was no private cause of action against an attorney for the unauthorized practice of law in Utah. *See* Utah Code § 78A-9-103(2) (2013) (stating that the "prohibition against the practice of law . . . shall be enforced by any civil action or proceeding instituted by the Board of Commissioners of the Utah State Bar"). By contrast, legal malpractice was (and still is) a cause of action that's brought by the private client. *See, e.g.*, *Thomas v. Hillyard*, 2019 UT 29, 445 P.3d 521; *Morgan v. Intermountain Health Care, Inc.*, 2011 UT App 253, 263 P.3d 405. This recently changed, however, with the passage of a bill in Utah that allows a client to bring a suit "if the client sustains damages or other harm as a result of" an attorney "engaging in the unauthorized practice of law." Utah Code § 78A-9-103(5)(a) (effective May 6, 2026).

¶81 While we do see some potential conceptual overlap between these two causes of action, we also see some key differences. A cause of action for the unauthorized practice of law is concerned with the licensing status of the attorney in question. *See id.* § 78A-9-103(2). A cause of action for legal malpractice, however, turns, in relevant part, on whether the attorney breached the attorney's "duty to act with reasonable diligence toward" the client, thus focusing on whether the attorney acted with "such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake." *Nielsen v. LeBaron*, 2023 UT App 29, ¶ 17, 527 P.3d 1133 (quotation simplified). It's not clear to us that Utah's interest in regulating the *practice of law* in Utah (i.e., in ensuring that all attorneys are properly licensed) is so pronounced that it would be unfair or unreasonable to enforce a forum selection clause that would dictate that a *legal malpractice* claim must be litigated elsewhere. And in their briefing, the Plaintiffs have provided us with no authority that says so.

¶82 Moreover, we note that the district court ruled on the enforceability of a forum selection clause, but it did not purport to settle any issues relating to the choice of law. Thus, the only thing before us is *where* the case will be litigated, not *which state's* substantive law would govern. As a result, even if it's true that Utah has more of an interest in the practice of law within Utah than Nevada does, to prevail on this motion, the Plaintiffs would need to demonstrate that it would be unfair or unreasonable to enforce the clause requiring those claims to be litigated in Nevada courts (which, in theory, could apply Utah law to those claims). All things considered, the Plaintiffs simply have not carried their burden on this point.

¶83 Third, the Plaintiffs point out that under Utah Code section 78B-3a-202(1)(b), a Utah plaintiff who brings an action

"for the determination, in any form, of the right or interest in . . . real property" must do so "in the county in which the real property, or some part of the real property, is situated." In their view, because their constructive trust claim implicates ownership over property located in Utah, "Utah law requires" this claim "to be brought in Washington County," thereby "preempt[ing] the Agreement's forum-selection clauses to the contrary."

¶84    But in *Prows*, our supreme court held that the "unfair or unreasonable" analysis turns, in large part, on whether enforcing the forum selection clause would "for all *practical purposes* . . . deprive[]" the plaintiff "of his day in court." 868 P.2d at 812 (emphasis added, quotation otherwise simplified). On the basis of what's been presented to us, it's not clear that enforcing the forum selection clauses would, as a practical matter, deprive the Plaintiffs of their day in court. It seems that the answer to this question would turn on a series of related subsidiary questions: (1) whether the particular kind of constructive trust claim that the Plaintiffs have made (which, as we've explained, was something of a hybrid legal malpractice/property claim) is indeed covered by Utah Code section 78B-3a-202(1)(b); (2) if the answer to that question is yes, whether the parties could nevertheless agree, through a freely negotiated forum selection clause, to have a claim affecting the interests in a Utah property litigated in Nevada's courts (while still applying Utah law); (3) if they could not, whether Nevada courts also have jurisdiction over that kind of suit, or, at least, a kind of suit that for practical purposes would give them similar relief; and finally (4) if the Nevada courts don't have jurisdiction over such a claim, whether the end result would be so unfair or unreasonable that Utah courts should not enforce the forum selection clause at all.

¶85    These are complicated questions, but the Plaintiffs' briefing on them is cursory. The relevant portion of their brief is just a single paragraph. Other than a bare citation to section 78B-

3a-202(1), they cite no other legal authority in this portion of their brief. And they provide no detailed legal analysis explaining how the alleged jurisdictional problems created by section 78B-3a-202 would intersect with the "unfair or unreasonable" test in a manner that would render the forum selection clauses unenforceable. We're not going to do the work for the Plaintiffs on this front. While we're cognizant of the reality that a claim involving Utah property would likely belong in a Utah court, the Plaintiffs have simply not carried their burden of persuading us that, under these circumstances, their decision to file this constructive trust claim is a reason to make the forum selection clauses unenforceable.

¶86　Finally, the Plaintiffs argue that it would be unfair or unreasonable to allow a Nevada attorney who allegedly engaged in legal malpractice in Utah but didn't have a Utah license to "run to her hometown judges when that unauthorized practice turns into litigation." At its core, this argument essentially suggests that, as a matter of law, Nevada judges would be so institutionally biased in favor of a Nevada attorney that they cannot be trusted to adjudicate the case. The Plaintiffs cite no authority for this rather startling proposition, and we see none. And even if it were somehow true, it would in theory cut both ways—i.e., the Defendants could plausibly claim that it would be unfair to allow the Plaintiffs (which include several Utah-based LLCs) to run to their "hometown judges" in Utah. Without anything more, we reject the suggestion that we can or should cast blanket aspersions on the judiciary of an entire state, thereby rendering a forum selection clause unenforceable as a result.

¶87　For all these reasons, we see no basis for overturning the district court's rejection of the Plaintiffs' claim that it would be unfair or unreasonable to enforce the forum selection clauses.

### III. Applicability to the Non-Signatory Plaintiffs

¶88 Finally, the Non-Signatory Plaintiffs challenge the district court's determination that, as a matter of contract interpretation, they are bound by the Litigation Clause. On this, we again agree with the district court.[16]

¶89 "When interpreting a contract, a court first looks to the contract's four corners to determine the parties' intentions, which are controlling." *Pearce v. Purple Innovation, Inc.*, 2025 UT App 45, ¶ 22, 568 P.3d 649 (quotation simplified), *cert. denied*, 574 P.3d 524 (Utah 2025). "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Id.* (quotation simplified).

¶90 As indicated, the Litigation Clause said that "[a]ny litigation . . . brought in connection with or as a result of the Firm's representation of *the Client*" must be brought in Nevada. (Emphasis added.) Elsewhere in the Agreement, "the Client" was defined as including "Hsieh (in his individual capacity), PCVI, LLC, . . . and their respective affiliates, as well as such other entities or persons as mutually agreed by the parties."

¶91 The initial question on this issue, then, is what the term "affiliates" means. "In interpreting contracts, . . . ordinary meaning is often . . . determined through standard, non-legal dictionaries." *South Ridge Homeowners' Ass'n v. Brown*, 2010 UT

---

16. The district court also held that, as a matter of plain language, PCVI was bound by the General Clause. PCVI does not challenge that conclusion in this appeal. Instead, this issue is centered on the Non-Signatory Plaintiffs' arguments about whether the Litigation Clause is binding on them.

App 23, ¶ 1, 226 P.3d 758 (quotation simplified). Merriam-Webster defines "affiliate" as "an affiliated person or organization,"[17] and it defines "affiliated" as "closely associated with another typically in a dependent or subordinate position."[18] In some circumstances, plain or ordinary meaning may also be derived from the applicable legal context. *See State v. Rasabout*, 2015 UT 72, ¶ 10, 356 P.3d 1258; *Armenta v. Unified Fire Auth.*, 2025 UT 26, ¶ 26, 573 P.3d 1283. Under the Utah Revised Business Corporation Act, the term "affiliate" is defined as "a person that directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, the person specified." Utah Code § 16-10a-102(2). Thus, we think it reasonable to conclude that the term "affiliate" here referred to an entity that was subordinate to or under the control of Hsieh or PCVI.

¶92 There is no dispute that this was so with respect to each of the Non-Signatory Plaintiffs.

- Hsieh was listed as the sole member/manager on the certificate of organization of Tony Utah, LLC, which was later renamed as Utah TH, LLC.

- Utah TH, LLC, was listed as the sole member/manager on the certificate of organization of 1000 East Holmstead Ranch, LLC.

- In conjunction with the purchase of the ranch, 1000 East Holmstead Ranch, LLC acquired 100% of the membership interest of Holmstead Ranch Resort, LLC, an organization

---

17.  *Affiliate*,  Merriam-Webster,  https://www.merriam-webster.com/dictionary/affiliate [https://perma.cc/M4VN-BVPK].

18.  *Affiliated*,  Merriam-Webster,  https://www.merriam-webster.com/dictionary/affiliated [https://perma.cc/3RE2-KPX5].

that had previously been formed by the former owner of the ranch. The purchase and sale agreement of the ranch was signed by Yeh on behalf of 1000 East Holmstead Ranch, LLC.

¶93 Despite all this, the Non-Signatory Plaintiffs assert that the term "affiliates" should be interpreted as only referring to entities that were affiliates of Hsieh or PCVI at the time of the Agreement. But nothing in the Agreement actually said that. Instead, the relevant language defined "the Client" as including the "respective affiliates" of Hsieh or PCVI without any such qualification. The parties could have written such a term into the Agreement if they wanted to. But they didn't. Given this silence, we're hesitant to do so for them. *See, e.g., Bakowski v. Mountain States Steel, Inc.*, 2002 UT 62, ¶ 19, 52 P.3d 1179 ("We will not make a better contract for the parties than they have made for themselves.").

¶94 We note that in the course of arguing this issue on appeal, the parties have pointed to competing lines of cases from other jurisdictions that concern this precise issue—whether clauses in contracts referring to "affiliates" can bind affiliates that were not created or were not yet affiliates at the time the contract was formed.

¶95 The Plaintiffs, for example, argue that to "bind non-parties to a contract," parties "must have the authority to do so and must state their intention to do so clearly," and they cite *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 390–93 (S.D.N.Y. 2019), to support this proposition. Consistent with this principle, they point to cases that required a contract to include "express, forward-looking language" before a court would hold that the contract was binding on an affiliate that didn't exist or was not yet an affiliate at the time the contract was formed. *See, e.g., Revitch v. DIRECTV, LLC*, 977 F.3d 713, 718 (9th Cir. 2020)

(holding that without "forward-looking language," the agreement at issue did not cover entities that became affiliated with the party "years after the contract was signed in an unrelated corporate acquisition"); *VKK Corp. v. National Football League*, 244 F.3d 114, 130 (2d Cir. 2001) (holding that an agreement did not bind future members when the agreement's reference to "affiliates" was "stated in the present tense" and the agreement's definition of "affiliate" did not indicate "the inclusion of future rather than present members").

¶96 The Defendants, however, contend that such cases are distinguishable because either (1) they involved affiliates who had nothing to do with the business of the signatory party or (2) the agreements at issue included "contractual language that temporally limit[ed] who [was] bound." By contrast, the Defendants argue that because the Agreement here covered "legal services" on things like the "provision of real estate," and because this was "by its very nature, prospective," it would be reasonable to conclude that it did contemplate that future affiliates would be bound. And they also point out that there was no limiting language in the Agreement.

¶97 Reviewing the relevant authorities, we note that in *Arcadia Biosciences*, the court surveyed the caselaw in this area and concluded that such caselaw held that "defendants could enforce a forum selection clause against a non-signatory plaintiff who was closely related to the disputes arising out of the agreement[]." 356 F. Supp. 3d at 394 (quotation simplified). The court noted that "a non-signatory was determined to be closely related, in turn, if it was foreseeable that it would be bound to a forum selection clause." *Id.* (quotation simplified). We conclude that this is a reasonable statement of the law, and we endorse it here.

¶98    Applied to this case, we agree that the Non-Signatory Plaintiffs are bound by the clause in question. As explained, the Agreement expressly contemplated that the Firm's legal services would include the acquisition of real estate, and it's undisputed that the Non-Signatory Plaintiffs were either created or acquired for that very purpose. Moreover, the amended complaint asserts legal malpractice claims against the Defendants, but the Defendants' alleged legal duties are derived from the Agreement. As a result, it seems clear enough to us that the Non-Signatory Plaintiffs were benefitting from legal services that traced back to the Agreement, and that same Agreement includes the forum selection clauses at issue. From all this, we conclude that the Non-Signatory Plaintiffs are closely related to the dispute at hand and that it was accordingly foreseeable that they would be bound by the Agreement. We thus agree with the district court's rejection of this alternate rationale for opposing the motion to dismiss.

## CONCLUSION

¶99    We reverse the district court's conclusion that the Plaintiffs had not shown that Hsieh was incapacitated at the time he signed the Power of Attorney, and we remand that issue for further proceedings consistent with both this decision and the Defendants' request for discovery. But to the extent that the other issues raised by the Plaintiffs are still pending, we reject those arguments.

——————